ROBBINS v. ORIGINAL GAS ENGINE CO.

1. Master and Servant—Accident—Workmen's Compensation.
   Claimant, who applied for compensation for hernia that resulted from a sudden and violent effort on his part in attempting to disengage one side of a gas engine, which he and another were attempting to shove and which stuck to the floor, suffered from an accidental injury within the meaning of the workmen's compensation law, and was entitled to an award.

2. Same—Expert and Opinion Evidence.
   And under expert evidence that sudden development of hernia is impossible, but the rupture of the inguinal wall may be felt, that the sac is previously and gradually formed, and a single act of tension cannot ordinarily result in the protrusion, the board did not err in granting compensation, since the hernia occurred as the result of a strain, and, as a result, the sac protruded, which medical attention was required to alleviate.

3. Same—Amount of Compensation.
   A laborer, who had worked at painting engines for many years, and was employed by respondent for over nine years, and had labored continuously for a year, except seven weeks that he lost, was entitled to compensation on the basis of one-half his average weekly earnings to be found by dividing the amount received during the pre-

ceding year by 52; it was improper to award 300 times his average daily wages, a method of estimating damages which should be applied only if the employee has worked for a period considerably less than a year.

Certiorari to the Industrial Accident Board.   Submitted January 10, 1916.   (Docket No. 76.)   Decided March 31, 1916.

James F. Robbins presented his claim for compensation against the Original Gas Engine Company for injuries received while in respondent's employ.   From an order awarding compensation respondent and the Zurich General Accident & Liability Insurance Company, its insurer, bring certiorari.   Reversed.

*Ivan E. Kerr,* for appellants.
*Shields & Silsbee,* for appellee.

OSTRANDER, J.   It is the contention of respondents, plaintiffs in certiorari, that the testimony fails to prove accidental injury.   The testimony introduced on the part of claimant tended to prove that on January 22, 1915, while he assisted another in moving a gasoline engine weighing some 600 pounds, he suddenly had pain in his left groin, noticed a small swelling in the groin that night, consulted a physician, was advised that he had a hernia, and was operated upon for hernia. His claim is for compensation for time lost from February 6, 1915, to April 5, 1915, for medical attendance, hospital and ambulance fees, a total of $167.08.   This amount was allowed by arbitrators, and, upon appeal, the allowance was affirmed.

Claimant had worked for the Original Gas Engine Company for about nine years, painting gasoline engines.   For three years the conditions under which he worked and the method of doing the work were the same.   Claimant described the injury, as well as the conditions, as follows:

"*Q.* What happened, Mr. Robbins?

"*A.* Well, in the course of painting the engines, we have to wash the grease off, and where we wash them there is a slope down to a drain, and pulling that engine up out of there, putting it where we are going to paint them,—a man takes hold of each side of the engine, on the shaft, pulls them up out of there.

"*Q.* And the engine stuck?

"*A.* Naturally, on the hump there. Two of us were working on the engine; Mr. Carr, the gentleman here, and myself. In order to move the engine, Mr. Carr would take hold of one shaft in a stooping position. On the 22d day of January, when we were pulling the engine up out of there, Mr. Carr had the long end of the shaft and I had the short end, gave him a little advantage, but we don't look at that. Anyway, my side seemed to get behind, and I used extra effort to start it, and at that time I felt pain.

"*Q.* Just describe, if you will, the position you were in, what doing, and where the pain was.

"*A.* Well, we were stooping over, in a stooped position (indicating), pulling, and the pain shot up across my side of my body in the groin. As near as I can figure, the engine we were pulling weighed somewhere in the neighborhood of 600 pounds. I have never previously suffered similar pain in the region of my groin. I have never had any attacks similar to what developed after this pain. The pain I suffered was simply a pain that shot around there, and I felt weak afterwards. I did not do anything concerning the pain immediately, but noticed it once in a while. I looked my body over that night to see whether there was any injury, and I noticed a small swelling in the left groin. This swelling was not there when I went to work that morning. I do not know of anything that occurred to me that would have caused the swelling, except this strain and lifting the time I felt the pain. When I discovered the swelling, I was worried about it and consulted Dr. F. A. Jones; that would be on Saturday evening. He did not make any investigation of my body at that time, although I described the sense of pain that I had and the swelling. He did not see the swelling that night, neither did he prescribe anything for me. He said, I don't remember the doctor's exact words, something to the effect that a cold had settled in the glands and it would pass away in a day or two.

I went back to the same doctor again on Monday after that Saturday night. I worked Saturday, and the following Monday I went back to the doctor because the swelling was larger. The doctor at that time made an examination and said that I had hernia."

On cross-examination he testified:

"Prior to January 22, 1915, I did not have a hernia. I know what a hernia is, in a way. It is the breaking of the lining of the stomach, and, while I don't really know whether I had a hernia before or not, I never had any pain or swelling down there. Never had any trouble there.

"*Q.* You don't know whether you had a hernia or not?

"*A.* Well, according—if that is what I had, I never had one before. I have been employed with the Original Gas Engine Company for almost nine years.

"*Q.* And how long had you been doing this particular class of work?

"*A.* Ever since 1 have been there.

"*Q.* The very same kind of work?

"*A.* Exactly. The conditions of the factory during the nine-year period was not exactly the same as on January 22, 1915, 'cause the Original Gas Engine Company have moved into these quarters about three years ago and previous to that time, of course we did not have the same floor to work on.

"*Q.* Then for three years you had been doing the work in the exact manner you were doing the work under date of January 22d?

"*A.* (Witness nods yes.)

"*Q.* The engine weighed, you say, in the neighborhood of 300 to 600 pounds?

"*A.* Somewheres in the neighborhood of 600.

"*Q.* You have been handling the same make of engine right along?

"*A.* Yes; of course, you understand these engines are not the same size.

"*Q.* And when you were lifting the engine on this particular day, at this particular time, you merely felt a pain?

"*A.* A sharp pain, yes.

"*Q.* That was all out of the ordinary that happened at that time?

"*A.* Yes. * * *

"*Q.* You were doing the same class of work you had been doing for nine years?

"*A.* Yes, sir.

"*Q.* There was nothing whatever out of the ordinary that you did on that particular day?

"*A.* No, sir."

And on redirect:

"*Q.* Mr. Robbins, do you ever remember any other occasion where any engine weighed as much as this one stuck and you had to exert yourself as you did in this case to move it?

"*A.* I couldn't state any particular case, but there has been engines; it is a cement floor, and cast iron has a tendency to stick.

"*Q.* Had it occurred before that day at all, that you remember?

"*A.* Well, I presume there has been engines sticking down there, but I couldn't name any particular time.

"*Q.* Could you say for sure whether they stuck so you had to exert extra strength?

"*A.* I couldn't do it."

The history of the particular case excludes the idea of the use, with violence, of an instrument, or substance, puncturing or rending the abdominal wall.

A physician, the one first consulted by claimant, testified that in his opinion the hernia was caused by the strain in moving the engine. He further testified that when he first examined claimant he was able to reduce the hernia with his finger; that there were no adhesions. In these circumstances he found support for his conclusion that this was a new and not an old hernia. The surgeon who operated upon claimant testified that in his opinion the hernia was produced by the exertion described by claimant. All the experts seem to agree that the visible evidence of the hernia is the protrusion through the inguinal ring of the peritoneum and its contents; "the hernia is the peritoneum

going through, accompanied by the intestines or some other substance."

But the testimony for respondents is to the effect that the peritoneum is incapable of sudden, and is capable of very gradual, extension; that the sudden complete development of hernia in a pathological sense is impossible, but the hernia may be felt—the sudden projection of hernial contents into the preformed sac —for the first time during a straining effort. Various medical authorities to which the court is referred appear to sustain the proposition that hernia is of slow formation and can never arise from a single augmentation of intra-abdominal tension, however great it may be. It may be said that the testimony of claimant's experts does not deny this proposition; that they regarded the condition which they found—the condition they undertook to relieve—as caused by the strain and exertion of the claimant. They found a hernia, a protrusion, to be reduced, and found cause for it in the described strain and exertion of claimant.

The Michigan law does not award compensation for all personal injuries suffered by an employee, but for accidental injuries only. *Adams* v. *White Lead & Color Works*, 182 Mich. 157 (148 N. W. 485, L. R. A. 1916A, 283). The vital question which the Industrial Accident Board had to determine was not whether on January 22, 1915, it was discovered that claimant had hernia, but was whether claimant on that day suffered an accidental injury, arising out of and in the course of his employment. Accepting respondents' proposition as true, it may be said that upon the occasion in question, by reason of a strain, or effort, of claimant, in performing his duties, an undiscovered and undiscoverable, but previously formed, sac was pushed through the left inguinal ring and muscles. So much injury claimant then and there suffered, to alleviate, if not to cure, which medical attention and treatment

were required. It is compensation for that injury which is claimed and was allowed. Was it an accidental injury within the meaning of the law? It has been said of the expressions "accident" and "accidental," employed in an act having a purpose similar to ours, that they were used with their popular and ordinary meaning. Happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected.

"If a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means." *United States Mutual Accident Ass'n* v. *Barry,* 131 U. S. 100, 121 (9 Sup. Ct. 755, 762).

This is a case relied upon by respondents.

It has been held that death resulting from a ruptured artery was not accidental when the rupture occurred while the insured was reaching from a chair to close a window, did not slip or fall or lose his balance, and nothing unforeseen occurred except the bursting of the artery. *Feder* v. *Traveling Men's Ass'n,* 107 Iowa, 538 (78 N. W. 252, 43 L. R. A. 693, 70 Am. St. Rep. 212). An examination of cases arising principally upon accident insurance policies, some of which are collected in a note to *Lehman* v. *Accident Ass'n,* 42 L. R. A. (N. S.) 562, discloses that in the opinions which seem to be best considered the distinction is observed between the means by which an injury is produced and the result of the producing cause or causes. It is not sufficient that there be an unusual and unanticipated result; the means must be accidental—involuntary and unintended. There must, too, be some proximate connection between accidental means and the injurious result. It is doubtful, however, if in

applying our statute, its general purpose being considered, the court should exactly follow the rules suggested and applied in the cases referred to. The statute seems to contemplate that an accidental injury may result by mere mischance; that accidental injuries may be due to carelessness, not wilful, to fatigue, and to miscalculation of the effects of voluntary action. There is testimony in the record, although it is not very conclusive, to support a finding that claimant was suddenly, and accidentally, put at disadvantage by the act of his fellow workman and the sticking of the engine on the concrete floor, and that the rupture and immediate protrusion of the abdominal sac were caused by his efforts to retrieve his position and do his work. It is assumed that it was the first time the sac had been forced through the abdominal wall. If it is also assumed that there was a certain lack of physical integrity in the parts where the injury was manifested, still I think claimant may have compensation for the injury he suffered. I decide only the particular case, and in doing so decline to hold, upon this record, that claimant suffered from disease and not from accidental injury. See *Grove* v. *Paper Co.*, 184 Mich. 449 (151 N. W. 554).

The method employed by the board to ascertain the amount of claimant's wages is questioned. Claimant had been employed by the Original Gas Engine Works for nine years. During the period from February 6, 1914, to February 6, 1915, he worked the entire time except seven weeks—42 working days. His wages were $19.50 per week. He earned and received $790.15 during the year. The average weekly wages actually earned during the year was $15.20, one-half of which is $7.60. But claimant was awarded $8.76 a week, or an average weekly wage of $17.52. It was ruled that, having lost seven weeks, claimant had not worked substantially the whole year, in the same employment,

191 Mich.—9.

immediately preceding his injury, and that 300 times the average daily wage was the average annual earning. The statute, so much of it as is material, provides (2 Comp. Laws 1915, § 5441) :

"Sec. 11. The term 'average weekly wages' as used in this act is defined to be one fifty-second part of the average annual earnings of the employee. If the injured employee has not worked in the employment in which he was working at the time of the accident, whether for the employer or not, during substantially the whole of the year immediately preceding his injury, his average annual earnings shall consist of three hundred times the average daily wage or salary which he has earned in such employment during the days when so employed. If the injured employee has not worked in such employment during substantially the whole of such immediately preceding year, his average annual earnings shall consist of three hundred times the average daily wage or salary which an employee of the same class working substantially the whole of such immediately preceding year in the same or a similar employment in the same or a neighboring place, shall have earned in such employment during the days when so employed. In cases where the foregoing methods of arriving at the average annual earnings of the injured employee cannot reasonably and fairly be applied, such annual earnings shall be taken at such sum as, having regard to the previous earnings of the injured employee, and of other employees of the same or most similar class, working in the same or most similar employment, in the same or neighboring locality, shall reasonably represent the annual earning capacity of the injured employee at the time of the accident in the employment in which he was working at such time."

Claimant had worked in the employment, that is, in the capacity and line of work in which he was working at the time of his injury, for many years—not only substantially, but wholly. It was therefore manifestly improper to employ the factor of average daily wages in determining the average weekly and annual wages.

It is obvious, too, that the average annual wages of one employed for years in the same capacity and line of work cannot be determined except by comparing the wages of two or more years. A man may change his employment or the capacity in which he follows it. If he has done this at a time substantially less than a year before his injury, then the statute fixes 300 times his average daily wages as his average annual wages. For the man who works for years in the same employment and is injured, the statute fixes average weekly wages at 1/52 part of his average annual earnings. This is the rule which should be applied in this case. The record does not supply the information required to make a finding.

It is assumed that the parties in interest can easily ascertain and agree about the annual earnings of claimant for a period of at least three years. It is, of course, possible that the award made is substantially a correct award; but, the rule applied being inapplicable, it must be set aside.

STONE, C. J., and KUHN, BIRD, MOORE, STEERE, BROOKE, and PERSON, JJ., concurred.