INDIAN CREEK COAL AND MINING COMPANY *v.* CALVERT
ET AL.

[No. 10,129.   Filed May 17, 1918.   Rehearing denied November 20,
1918.]

1. MASTER AND SERVANT.—*Workmen's Compensation Act.—Appeal.
—Sufficiency of Evidence.—Scope of Review.*—On an appeal from
an award of compensation under the Workmen's Compensation
Act, Acts 1915 p. 392, §80201 *et seq.* Burns' Supp. 1918, only where
in determining the sufficiency of the evidence to sustain the
award, will   consider only the evidence favorable to appellees,
together with all favorable inferences deducible therefrom.   p. 479.

2. MASTER AND SERVANT.—*Workmen's Compensation Act.—Injury
in Course of Employment.*—In a proceeding under the Work-
men's Compensation Act, Acts 1915 p. 392, §80201 *et seq.* Burns'
Supp. 1918, for compensation for the death of a servant, where it
appeared that decedent, a coal miner, died from a ruptured aorta,
which was diseased, shortly after extraordinary exertion in
attempting to move a heavy coal car, the injury occurred in the
course of the employment.   p. 479.

3. MASTER AND SERVANT.—*Workmen's Compensation Act.—Death
Due to Disease.—Right to Compensation.*—The fact that a servant
is afflicted with a fatal malady is sufficient to defeat a claim for
compensation for his death under the Workmen's Compensation
Act, Acts 1915 p. 392, §80201 *et seq.* Burns' Supp. 1918, the court
his decease was in part the result of his ailment progressing nat-
urally and disassociated from any injury that he may have suf-
fered by accident arising out of and in the course of employment,
but if such an injury concurs with the ailment in hastening the
disease to a fatal termination, the right to an award exists.
p. 480.

4. MASTER AND SERVANT.—*Workmen's Compensation Act.—Death
of Servant.—Award.—Evidence.—Sufficiency.*—In a proceedings
under the Workmen's Compensation Act, Acts 1915 p. 392, §80201
*et seq.* Burns' Supp. 1918, for the death of a servant, evidence
showing that decedent was afflicted with a disease of the aorta
which resulted in the walls thereof becoming weaker and unnat-
urally thin, that, shortly after deceased had exerted himself extra-
ordinarily in attempting to move a heavy coal car, became ill and
died, death resulting from a rupture of the aorta, and that any
excitement or exertion might cause such a rupture, is sufficient
to sustain a finding that the injury was by accident arising out of
the employment.   pp. 481, 483, 495.

5. MASTER AND SERVANT.—*Workmen's Compensation Act.—Accident.*—The word accident, as used in workmen's compensation acts, is employed in its popular sense, and means any unlooked for mishap or untoward event not expected or designed. p. 482.

6. MASTER AND SERVANT.—*Workmen's Compensation Act.—Personal Injury.*—A personal injury, as the term is used in the Workmen's Compensation Act, Acts 1915 p. 392, §80201 *et seq.* Burns' Supp. 1918, refers not to some break in some part of the body or wound thereon, or the like, but rather to the consequence or disability that results therefrom. p. 495.

7. EVIDENCE.—*Proof by Inference.—Inferences Based on Inferences.*—Although it is not permissible, for the purpose of supporting a proposition, to draw an inference from a deduction which is itself purposely speculative and unsupported by an established fact, since at the beginning of every line of legitimate inferences there must be a fact, known or proved, yet, where there is such a fact, it is the duty of the court to draw thereupon the most reasonable legitimate inferences and an inference so drawn merges itself into the proved fact, which may be a basis for other proper inferences. p. 495.

From the Industrial Board of Indiana.

Proceedings for compensation under the Workmen's Compensation Act by Laura Calvert and others against the Indian Creek Coal and Mining Company. From an award for applicants, the defendant appeals. *Affirmed.*

*Charles E. Henderson* and *James L. Murray,* for appellant.

*LeRoy M. Wade* and *Arnold J. Padgett,* for appellees.

CALDWELL, J.—The sole question presented by this appeal is whether the evidence was sufficient to sustain the finding of the Industrial Board that the death of Addison Calvert, of whom appellees were dependents, was the result of a personal injury "by accident arising out of and in the course of" his employment, within the meaning of the Workmen's Compen-

sation Act. Acts 1915 p. 392, §80201 *et seq.* Burns' Supp. 1918.

The evidence most favorable to appellees' cause, and which for the most part was uncontradicted, is to the following effect: On and for some time prior to January 3, 1917, decedent was in appellant's employ as a coal miner. As a rule he worked regularly when the mine was running. When the mine was not running he worked at the blacksmith's trade doing repair work, and also at times as a section hand on the railroad. His friends and acquaintances regarded him as a strong healthy man, and had no knowledge that he had any physical ailment. Prior to January 3, 1917, he had not required the services of a physician at any time. Occasionally, however, when coughing, he complained that his side hurt him. Periodically or occasionally he indulged in the use of intoxicants excessively, and at such times he laid off from work for a few days. At 7 o'clock on the morning of January 3, 1917, he went to work in room 12 of appellant's mine. His son, aged twenty-five, was working with him. About 8 o'clock, having a quantity of coal ready to load, he and his son went into room 11, adjoining room 12, for the purpose of shoving a partly loaded car from the former to the latter. The track extended from room 11 up grade for a distance, and then down grade into room 12. Decedent and his son attempted to push the car up over the grade, but found it too heavy for their strength. The son then called two other miners, Mr. Snap and his son, who were working in a room adjoining room 11, to come and assist in moving the car. The four workmen pushed the car up over the top of the grade. Snap and his son returned to

their work and decedent and his son moved the car down grade into No. 12. Mr. Snap testified that when they came to assist decedent and his son, decedent "was talking the same as he always had—was cutting up and was all right as far as I knew anything about it—as far as I could tell he was a strong, hearty looking man," but that eventually "when we pushed the car on the switch there, he said 'Oh, my side' and he just went on and he never said anything more, and we just left and went back to our working place." Decedent and his son moved the car down the grade into room 12, and commenced to load it. The further account of the occurrence, as testified to by the son, is as follows: "He was on one side of the car and I on the other. I heard him holler 'Oh.' He was leaning against the car holding his side, and I kept asking him what was the matter, and he says 'I don't know,' and kept saying 'Oh, my side.' He had his hand on his left side. He said 'Take me over to the other side of the car and lay me down.' I went around and he leaned against me and I helped him around the corner of the car and laid him down on a slack pile. He wanted a drink of water and I got my bucket and gave him the water, but he said he couldn't drink it." The son then went and got Mr. Snap and his son to stay with decedent while he went for help. Mr. Snap testified that: After returning from helping to push the car, "I don't believe we threw over a half dozen shovels in our car until his son came and hollered and we went into their room and found his father lying down on slack, holding his hand over his heart." Decedent died in the company's office at about 10:45 the same morning. When the collapse came decedent was loading coal in the ordinary way.

He had just lifted a chunk of coal weighing thirty-five or forty pounds. The miners frequently loaded lumps weighing 75 to 100 pounds. The scoop that he was using weighed about 25 pounds loaded.

An autopsy was held on the body of decedent. It disclosed that the descending aorta had ruptured on the right side at a point about two inches below the arch; that a diseased condition existed at the point of rupture indicated by an unnatural thinness of the wall. There was expert medical evidence to the following effect: That such a diseased condition might result from any one of a number of causes, as chronic alcoholism, or a tubercular focus in one or more of the mediastinal glands lying next to the arterial wall; that the latter was probably the cause of the diseased condition as it existed in decedent; that there was no way to determine how long the thinning process had been going on; that it might have been several days or several weeks; that it is probable that the thinning process had been going on for several weeks; that when such a condition is caused by a tubercular focus, there will be a perforation with fatal hemorrhage sooner or later if the tubercular focus continues; that when such a condition exists any exertion or excitement which makes the heart beat more rapidly may produce a rupture; as the thinning continues a rupture might come while the patient is coughing or laughing, or performing ordinary work, or sleeping, or sitting still. A medical witness, who participated in the autopsy, gave it as his opinion that: "From the appearance of the wall and the condition we found there, it looked as though it might have been caused by a strain or exertion of some kind."

In determining the questions presented, since the finding of the board was in favor of appellees, we are required to consider only the evidence favorable to them as above outlined, together with all inferences reasonably deducible therefrom and favorable to their cause. The following is either directly established by or reasonably deducible from the evidence: That the shoving of the partially loaded car up over the grade required of decedent, and that he actually exerted, an unusual physical effort, both when assisted by his son alone and also when assisted by the Snaps in addition; as based on the expert evidence that such would be the effect, that such effort augmented the speed and increased the force of decedent's heart beats with the consequent added internal pressure on his diseased and weakened blood vessels; that the rupture of the aorta followed very shortly after the moving of the car, as indicated by the fact that the Snaps had thrown only about a half dozen shovels of coal until summoned back to decedent's assistance; and that such pressure on his blood vessels, induced as aforesaid, continued as a causative force until it terminated in the rupture; that the decedent became somewhat abnormal in physical condition while pushing the car, as indicated by his first outcry and his changed demeanor continuing thereafter, and that it is not improbable that the process of rupturing the aorta may have commenced when the car was being pushed.

Under the facts there can be no doubt that decedent suffered a personal injury, the rupture of the aorta, in the course of his employment, and that such personal injury speedily resulted in his death. We proceed to determine whether

such personal injury was by accident arising out of the employment.

It is apparent from the evidence that decedent was afflicted with a very serious physical ailment. His ailment, however, was not necessarily incurable or of such a nature that it was certain to terminate fatally. Under the expert evidence such ailment was certain to terminate fatally only in case of the continuance of the producing cause which was not certainly known. His ailment, however, was such that it was not improbable that at any time, sooner or later, there might be a rupture of the aorta and a consequent death. But assuming that decedent was afflicted with a fatal malady certain to result in his decease sooner or later, and that such malady was a cause of decedent's death here, these facts alone are not sufficient to defeat appellees' claim. Such result would follow only in case his decease was in fact the result of his ailment progressing naturally and disassociated from any injury that he may have suffered by accident arising out of and in the course of his employment. If there was such an injury, and it concurred with the ailment in hastening the latter to a fatal termination, then the right to an award exists. On this subject the doctrine adopted by this court is thus expressed: "The courts, consistent with the theory of workmen's compensation acts, hold with practical uniformity that, where an employe afflicted with disease receives a personal injury under such circumstances as that he might have appealed to the act for relief on account of the injury had there been no disease involved, but the disease as it in fact exists is by the injury materially aggravated or accelerated, resulting in disabil-

ity or death earlier than would have otherwise occurred, and the disability or death does not result from the disease alone progressing naturally as it would have done under ordinary conditions, but the injury, aggravating and accelerating its progress, materially contributes to hasten its culmination in disability or death, there may be an award under the compensation acts." *In re Bowers* (1917), 65 Ind. App. 128, 133, 116 N. E. 842.

Under the evidence here it is apparent that decedent's malady was an active and potent agency in causing his death. The question for our determination is whether it may be said from the evidence that he suffered an injury by accident arising out of his employment which concurred with his malady as an additional agency, or which rendered the latter effective to a fatal end. That is, was decedent's death caused solely by his disease progressing naturally, or did he suffer an accident arising out of his employment which concurred with his malady to produce the tragedy which terminated his life? In determining this question the meaning of the word "accident," as used in the act, is important.

On the suggested question appellees point to *Haskell, etc., Car Co.* v. *Brown* (1918), 67 Ind. App. 178, 117 N. E. 555, as conclusive. That case is at least closely analogous to the case at bar. There the evidence disclosed that Brown after a somewhat heavy lift suddenly became ill, and that his illness shortly terminated fatally. There was evidence that he had a pre-existing weakened condition of an artery, and that the physical effort of lifting a heavy load produced a sudden arterial dilation, known as

an aneurism, which caused his death.  It is held in that case in effect that the evidence justified the conclusion that Brown suffered a personal injury by accident arising out of and in the course of his employment, which concurred with his ailment to produce his death, and that the award of the board should be affirmed.  We regard that decision as at least very persuasive of the correctness of the board's determination here.  Appellant, however, insists that the facts in that case were very different from those in the case at bar.  We regard the facts there as differing rather in degree than in kind from those here.  However, by reason of appellant's insistence, we look further into the decided cases.

In the Brown case there are authorities cited to the effect that this court is committed to the doctrine that the words "by accident arising out of and in the course of the employment," as used in the Workmen's Compensation Act, should be liberally construed in harmony with the humane purposes of the act.  In that case this court adopted as sound those decisions which hold that the word "accident," as it occurs in compensation acts, is used in its popular sense, and means "any unlooked for mishap or untoward event not expected or designed."  In addition to the authorities there cited, see the following:  *Vennen* v. *New Dells Lumber Co.* (1915), 161 Wis. 370, 154 N. W. 640, L. R. A. 1916A 273; *Bystrom Bros.* v. *Jacobson* (1916), 162 Wis. 180, 155 N. W. 919, L. R. A. 1916D 966; *Adams* v. *Acme White Lead, etc., Works* (1914), 182 Mich. 157, 148 N. W. 485, L. R. A. 1916A 283, Ann. Cas. 1916D 689; *Southwestern Surety Ins. Co.* v. *Pillsbury* (1916), 172 Cal. 768, 158 Pac. 762; *Clover, etc., Co.* v. *Hughes* (1910), L. R. A. C. 242, 3 B. W. C. C. 275.

The meaning assigned to the word "accident," as used in compensation acts, must be distinguished from its meaning as used in accident insurance policies. *Southwestern Surety Ins. Co.* v. *Pillsbury, supra; Robbins* v. *Original Gas Engine Co.* (1916), 191 Mich. 122, 157 N. W. 437; *Fenton* v. *J. Thorley & Co.* (1903), 19 T. L. R. 684, 5 W. C. C. 1.

For the meaning assigned to the word as used in the latter relation, see *United States Casualty Co.* v. *Griffis* (1917), 186 Ind. 126, 114 N. E. 83, L. R. A. 1917F 481; *Schmid* v. *Indiana, etc., Accident Assn. Co.* (1908), 42 Ind. App. 483, 85 N. E. 1032; *United States, etc., Assn.* v. *Barry* (1888), 131 U. S. 100, 9 Sup. Ct. 755, 33 L. Ed. 60.

Under the authorities, and especially the more recent ones, there can be but little doubt that the word "accident," as used in compensation laws, is

4.   correctly defined by this court in the Brown case. More difficulty arises in seeking to apply the definition to specific facts.

One of the earlier cases defining the word "accident," as defined by this court in the Brown case, is *Fenton* v. *J. Thorley & Co., supra,* decided by the British House of Lords in 1903. In that case Fenton in the course of his employment was required at stated intervals to move a level and turn a wheel connected with a certain press, for the purpose of thereby raising a lid that the contents of the press might be removed. On one occasion the wheel would not turn, whereupon he called a fellow workman to his assistance, and while attempting to move the wheel by their combined efforts, Fenton felt something which he described as a "tear" on his "inside," and it was discovered that he was ruptured. The House of

Lords, reversing the Court of Appeal and the county court, held that Fenton's injury was the result of an accident, and that he was entitled to compensation under the English act. In the course of his opinion Lord Macnaghten said: "There was no evidence of any slip, or wrench, or sudden jerk. It may be taken that the injury occurred while the man was engaged in his ordinary work, and in doing or trying to do the very thing which he meant to accomplish.  *  *  * If a man, in lifting a weight or trying to move something not easily moved, were to strain a muscle, or rick his back, or rupture himself, the mishap in ordinary parlance would be described as an accident. Anybody would say that the man had met with an accident in lifting a weight, or trying to move something too heavy for him.  *  *  *. A man injures himself by doing some stupid thing, and it is called an accident, and he gets the benefit of the insurance. It may even be his own fault, and yet compensation is not to be disallowed unless the injury is attributable to 'serious and wilful misconduct' on his part. A man injures himself suddenly and unexpectedly by throwing all his might and all his strength and all his energy into his work by doing his very best and utmost for his employer, not sparing himself or taking thought of what may come upon him, and then he is to be told that his case is outside the Act because he exerted himself deliberately, and there was an entire lack of the fortuitous element. I cannot think that that is right."

Lord Shand said in the course of his opinion: "I think it (accident) denotes or includes any unexpected personal injury resulting to the workman in the course of his employment from any unlooked for mishap or occurrence."

Lord Robertson said: "No one out of a law court would ever hesitate to say that this man met with an accident; and, when all is said, I think this use of the word is perfectly right. The word 'accident' is not made inappropriate by the fact that the man hurt himself. * * * Suppose the wheel had yielded and been broken by exactly the same act, surely the breakage would be rightly described as accidental. Yet the argument against the application of the Act is in this case exactly the same, that there is nothing accidental in the matter, as the man did what he intended to do. The fallacy of the argument lies in leaving out of account the miscalculation of forces, or inadvertence about them, which is the element of mischance, mishap, or misadventure."

The Fenton case disapproves *Hensey* v. *White* (1899), 2 W. C. C. 1, and the decisions in which that case has been followed, including *Roper* v. *Greenwood* (1900), 3 W. C. C. 23, the last named decided by the court of appeal. In the former, Hensey, while lifting up on a large fly wheel for the purpose of starting a gas engine, ruptured a blood vessel of his stomach, and as a consequence died from loss of blood. A *post mortem* disclosed a diseased condition, which had weakened the blood vessels of the stomach. The court of appeal held that the element of accident was entirely wanting; that: "The injury arose in the ordinary course of the deceased man's work, though there might have been a little more exertion used by him in that work on the occasion in question than was usual." In the Roper case. a woman suffering from prolapsus uteri was employed to do work that necessitated her lifting boxes which she knew were too heavy for her strength. With such knowledge

she continued the work, and, in attempting to lift a box, suffered a strain which aggravated her injury. The court of appeals, affirming the county court, held that there was no accident, being influenced somewhat apparently by the element of the knowledge of the woman, and the further element that the county court had determined the question as one of fact. Each of these cases, as we have said, was disapproved by the House of Lords in the Fenton case.

In the Fenton case *Stewart* v. *Wilsons, etc., Coal Co.*, 5 F. 120, decided by the Court of Sessions of Scotland in 1903, is cited with approval, the court by Lord Macnaghten saying that in that case: "A miner strained his back in replacing a derailed coal hutch. The question arose, Was that an accident? All the learned judges held that it was   *   *   *.   What the miner did in replacing the hutch he certainly did deliberately and in the ordinary course of his work. There was nothing haphazard about it. Lord McLaren observed that it was impossible to limit the scope of the statute. He considered that 'if a workman in the reasonable performance of his duties sustains a physiological injury as the result of the work he is engaged in' . . . 'this is accidental injury in the same sense of the statute.' Lord Kinnear observed that the injury was 'not intentional,' and that 'it was unforeseen. It arose,' he said, 'from some causes which are not definitely ascertained, except that the appellant was lifting hutches which were too heavy for him. If,' he added, 'such an occurrence as this cannot be described in ordinary language as an accident, I do not know how otherwise to describe it.' "

In *Fulford* v. *Northeast Coal, etc., Co.* (1907), 1

B. W. C. C. 222, Fulford, a chalk miner, was slightly ruptured when he commenced work for the defendant company. One morning, after several months' service, he attempted to remove with a pick a lump of chalk of unusual size, but not larger than lumps that he had frequently theretofore removed. As a result of the effort his rupture was aggravated, and as a consequence he was incapacitated for work. The court in deciding the case said in substance that, although what the man was doing, he was doing deliberately, and that nothing happened outside the ordinary course of the work which caused the injury, nevertheless, the injury was suffered by accident within the meaning of the English act. The court then said in substance that the fact that from a medical viewpoint the injury could not be said to have been unexpected when measured by the workman's condition and the thing done was not controlling.

*Clover, etc., Co.* v. *Hughes, supra,* decided by the House of Lords in 1910, affirming the judgment of the county court that the injury involved was by accident arising out of the employment, is to the same effect, and is also very closely in point here. The facts as outlined by Lord Loreburn, and as forming the basis of the decision, were in substance as follows: Hughes, a workman, was suffering from an aneurism in so advanced a stage that it might have burst at any time, as while he was asleep, and a very slight exertion or strain would have been sufficient to bring about a rupture of the blood vessel involved. In the course of his employment, Hughes was tightening a nut with a wrench, when the strain "quite ordinary in this quite ordinary work" ruptured the aneurism,

and he died. " 'The death was caused by a strain arising out of the ordinary work of the deceased operating upon a condition of body which was such as to render the strain fatal.' " The court adopted the finding of the county court that there was not sufficient evidence to establish that the workman had slipped. In discussing whether the county court was justified in holding that the rupture was an accident within the meaning of the British act, Lord Loreburn said: "Certainly it was an 'untoward event.' It was not designed. It was unexpected in what seems to me the relevant sense, namely, that a sensible man who knew the nature of the work would not have expected it. I cannot agree with the argument presented to your Lordships that you are to ask whether a doctor acquainted with the man's condition would have expected it." And after stating that popularly the fact that something goes wrong within the human frame is associated with the idea of the accidental, he said: "If that occurred when he was lifting a weight it would be properly described as an accident. So, I think, rupturing an aneurism when tightening a nut with a spanner (wrench) may be regarded as an accident. It cannot be disputed that the fatal injury was in this case due to this accident, the rupture of the aneurism." In discussing whether the accident arose out of the employment he said: "I do not think we should attach any importance to the fact that there was no strain or exertion out of the ordinary. It is found by the county court judge that the strain in fact caused a rupture, meaning, no doubt, that if it had not been for the strain, the rupture would not have occurred when it did. If the degree of exertion beyond what is usual

Indian Creek Coal, etc., Co. *v.* Calvert—68 Ind. App. 474.

had to be considered in these cases, there must be some standard of exertion, varying in every trade. Nor do I think we should attach any importance to the fact that this man's health was as described. If the state of his health had to be considered, there must be some standard of health, varying, I suppose, with men of different ages. An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or condition of health." And on the proposition whether the mere fact that a man's disease kills him while he is at work entitles him to compensation, he said: "I do not think so, and for this reason. It may be that the work has not, as a matter of substance, contributed to the accident, though in fact the accident happened while he was working. In each case the arbitrator ought to consider whether, in substance, as far as he can judge on such a matter, the accident came from the disease alone, so that whatever the man had been doing it would probably have come all the same, or whether the employment contributed to it." Lord Macnaghten, concurring, said: "The fact that the man's condition predisposed him to such an accident seems to me to be immaterial. The work was ordinary work; but it was too heavy for him. It must be taken on the finding of the learned county court judge that the accident was unexpected by the workman. * * * The fact that the result would have been expected, or indeed contemplated as a certainty, by a medical man of ordinary skill if he had diagnosed the case, is, I think, nothing to the purpose. An occurrence, I think, is unexpected, if it is not expected by the man who suffers by it."

In the Hughes case, and others which we have discussed, the question was squarely presented whether where a malady with which a workman is afflicted, unexpectedly to him terminates in his disability or death, while engaged in his ordinary work in the ordinary way, the concurring causes being the disease and the work, the effect of the latter aggravating the former to its serious or fatal consequences, the involved injury may be said to be by accident arising out of the employment. The affirmative of the proposition was held in each case, especially where such injury or death results from some definite occurrence, as the turning of the nut with a wrench in the Hughes case. Two members of the court, however, dissented in the Hughes case.

There are certain cases which on first view seem to be in conflict with the cases above discussed, among them O'Hara v. Hayes (1910), 3 B. W. C. C. 586, decided by the Court of Appeal of Ireland; Black v. New Zealand Shipping Co. (1913), 6 B. W. C. C. 720, decided by the Court of Appeal of England; Kerr v. Ritchies (1913), 50 S. L. R. 434, 6 B. W. C. C. 419, decided by the Court of Sessions of Scotland.

In the O'Hara case a workman, who had been suffering for some years from progressive heart disease, died while hurrying to a railway station with a parcel for his employer. The decision is indicated by the following: "The county court judge has found that there was no evidence of accident, and we are satisfied that he was right."

In the Black case, a ship officer worked vigorously for several days in superintending the loading of a ship. Six days later, while standing on the bridge of the ship, he suddenly died, there being medical

evidence that death was due to heart failure following the continuous strain of overwork. The trial court found that there was no evidence of an accident. This finding was affirmed on appeal.

It will be observed in each of the foregoing cases the finding below was against the applicant, by the court which primarily determines the facts.

In the Kerr case a workman apparently in good health died suddenly from heart failure while at work lifting baskets filled with corn. The court in holding that the facts did not show the existence of an accident distinguished the Clover case, *supra,* in that, in the Clover case there was a definite particular occurrence to which death could be attributed and was attributed, namely, the bursting of an aneurism just after the effort required in turning the wrench, while in the Kerr case the evidence failed to disclose anything in the nature of a definite particular occurrence.

It may be remarked here, as we said in substance in *Inland Steel Co.* v. *Lambert* (1917), 66 Ind. App. 246, 118 N. E. 162, that since the language of our act by which the right to compensation is limited, namely, "injury by accident arising out of and in the course of the employment" was taken literally, if remotely, from the English Workmen's Compensation Act, decisions of English courts of last resort prior to the enactment of our act, and construing such language as found in the English act, are at least very persuasive of what construction should be placed on such language as found in our act.

In an interesting article in the 25 Harvard Law Review, p. 328 *et seq.,* the author develops from the decided cases that the term "by accident" has been

consistently construed to include two different ideas—
that of unexpectedness, and that of injury sustained
on some definite occasion.  Developing also that the
English cases are steadily drifting towards a spirit
of increased liberality in favor of the injured work-
man, he says, at page 340 :  ''Since the case of *Fenton*
v. *Thorley* (*supra*) nothing more is required than
that the harm that the plaintiff has sustained shall
be unexpected.  It is no longer required that the
causes external to the plaintiff himself, which con-
tribute to bring about the injury, shall be in any way
unusual; it is enough that the causes, themselves
known and usual, should produce a result which on
a particular occasion is neither designed nor ex-
pected.  The test as to whether an injury is unex-
pected and so if received on a single occasion occurs
'by accident' is that the sufferer did not intend or
expect that injury would on that particular occasion
result from what he was doing.  What was actually
probable or even inevitable because of circumstances
unknown to the sufferer is even more unimportant.
The test is purely subjective to the injured work-
man.''  The author cites among other cases, *Clover,
etc., Co.* v. *Hughes, supra.*

We proceed to a brief consideration of the Ameri-
can cases.

In *Grove* v. *Michigan Paper Co.* (1915), 184 Mich.
449, 151 N. W. 554, a workman with a physical ail-
ment, due to a previous injury, suffered a rupture
of the femoral artery, while lifting sacks filled with
alum.  He was at the time doing his usual work in
the usual way, except that until two days previously
to the injury he was assisted by another man.  The
award of the board allowing him compensation was
affirmed.

To the same effect is *Bayne* v. *Riverside Storage, etc., Co.* (1914), 181 Mich. 378, 148 N. W. 412, where a workman contracted pneumonia following a heavy lift.

In *LaVeck* v. *Parke, Davis & Co.* (1916), 190 Mich. 604, 157 N. W. 72, L. R. A. 1916D 1277, a workman suffering from arterio sclerosis suffered a rupture of a blood vessel of the brain after a protracted period of ordinary work in circumstances where he was subjected to great heat. The Industrial Board held that he suffered an injury by accident arising out of the employment. The court on appeal, following and quoting from the Fenton and Hughes cases, *supra,* among others, affirmed the award. In the course of the opinion, the court construed the Bayne case, *supra,* saying: "In that case Mr. Bayne undoubtedly intended to do the lifting which he did, but he did not expect the effect would be to hurt his back, with resulting pneumonia. In the instant case Mr. LaVeck intended to do the prolonged work which the situation demanded, but he did not anticipate that because of doing so his blood pressure would be so increased as to result in the rupture of a cerebral blood vessel. * * * It was an unexpected consequence from the continued work in the excessively warm room." It will be observed that compensation was allowed in the LaVeck case, although the injury sustained could not be assigned to any definite occasion, or to any specific event, the injury resulting rather from prolonged labor, with no change in the circumstances or surroundings.

See, also, *Robbins* v. *Original Gas Engine Co., supra,* where a workman was ruptured in an effort to lift a heavy engine; also *Bell* v. *Hayes, etc., Co.*

(1916), 192 Mich. 90, 158 N. W. 179, where a workman suffered a rupture in endeavoring to lower a window which required considerable exertion; *Hurley* v. *Selden, etc., Construction Co.* (1916), 193 Mich. 197, 159 N. W. 311, where a workman suffered a like injury in lifting certain terra cotta window sills; *Bystrom Bros.* v. *Jacobson* (1916), 162 Wis. 180, 155 N. W. 919, L. R. A. 1916D 966, where a workman suffered a muscular strain in lifting cement blocks, the court citing, among others, *Fenton* v. *J. Thorley & Co.* and *Clover, etc., Co.* v. *Hughes, supra;* and *Schroetke* v. *Jackson, etc., Co.* (1916), 193 Mich. 616, 160 N. W. 383, L. R. A. 1917D 64, where a watchman's death was caused by heart failure induced by exertion and excitement growing out of the performance of his duty in giving an alarm of fire, the court citing and reviewing many of the English and American cases discussed in this opinion, and citing also and distinguishing the O'Hara, the Kerr and the Black cases discussed above. Also *Zappala* v. *Industrial Ins. Comm.* (1914), 82 Wash. 314, 144 Pac. 54, L. R. A. 1916A 295.

It will be observed that in some of the cases reviewed above, the accident is regarded as the physical break or the like in the body resulting from some occurrence or event, or course of events, rather than any such occurrence or event; while the injury is regarded as the physiological consequence of such break or the like rather than the latter. Thus, in *Clover, etc., Co.* v. *Hughes, supra,* a case involving the rupture of an aneurism, Lord MacNaghten, in illustrating that the workman suffered an accident, quoted from *Brintons* v. *Turvey* (1905), L. R. A. C. 230, to the effect that "the man broke part of his

body." Likewise, in *Fenton* v. *J. Thorley & Co., supra,* a case wherein a workman was ruptured, Lord Robertson, in arguing that the man met with an accident, illustrated his position by supposing that the wheel had broken, and said in substance that such an occurrence would have plainly been an accident, likewise the rupture.

This court seems to be committed to the doctrine that a personal injury, as that term is used in the Workmen's Compensation Act, has reference not to some break in some part of the body or some wound thereon, or the like, but rather to the consequence or disability that results therefrom. See *In re McCaskey* (1917), 65 Ind. App. 349, 117 N. E. 268, and cases.

After this somewhat extensive examination of the cases decided under statutes identical or practically identical to ours, we conclude that, even under the rule which requires that a definite occurrence must be identified in order that a certain injury may be said to be accidental, the injury here was by accident arising out of the employment.

The award is affirmed, with five per cent. damages as provided by §3 of the amendment of 1917 (Acts 1917 p. 154, §8020s2 Burns' Supp. 1918).

Ibach, C. J., Batman, P. J., and Felt and Hottel, JJ., concur.

Dausman, J., dissents.

### On Petition for Rehearing.

Caldwell, C. J.—It is earnestly insisted by appellant in support of its petition for a rehearing that, in arriving at the conclusion indicated by the prevailing opinion, we violated the rule that, in the process of establishing the truth of a

proposition by evidence, probative force may not be assigned to an inference deduced from some other inference. There is a rule to that effect. It, however, is frequently misinterpreted and misapplied. For the purpose of supporting a proposition, it is not permissible to draw an inference from a deduction which is itself purely speculative and unsupported by an established fact. Where an inference not supported by or drawn from a proved or known fact is indulged, and is then used as a basis for another inference, neither inference has probative value. Such a process may be described as drawing an inference from an inference, and is not allowable. At the beginning of every line of legitimate inferences there must be a fact, known or proved. *Cleveland, etc., R. Co.* v. *Starks* (1915), 58 Ind. App. 341, 106 N. E. 646. Where there is such a fact, the proper tribunal is not only permitted, but also it is its duty, to draw therefrom those legitimate inferences that seem to be most reasonable. An inference so drawn becomes a fact in so far as concerns its relation to the proposition to be proved. It merges itself into the proved fact from which it was deduced, and the resulting augmented fact becomes a basis for other proper inferences. To assign to an inference properly drawn a position inferior to an established fact would in effect nullify its probative force. The following we believe to be a sound discussion of the rule: "It was once suggested that an 'inference upon an inference' will not be permitted, i. e. that a fact desired to be used circumstantially must itself be established by testimonial evidence; that this suggestion has been repeated by a few Courts, and sometimes actually enforced. There is no such rule; nor

MAY TERM, 1918.     497

Indian Creek Coal, etc., Co. *v.* Calvert—68. Ind. App. 474.

can be. If there were, hardly a single trial could be adequately prosecuted. For example, on a charge of murder, the defendant's gun is found discharged; from this we infer that he discharged it, and from this we infer that it was his bullet which struck and killed the deceased. Or, the defendant is shown to have been sharpening a knife; from this we argue that he had a design to use it upon the deceased; and from this we argue that the fatal stab was the result of this design. In these and innumerable daily instances we build up inference upon inference, and yet no Court ever thought of forbidding it. All departments of reasoning, all scientific work, every day's life and every day's trials, proceed upon such data. The judicial utterances that sanction the fallacious and impracticable limitation, originally put forward without authority, must be taken as valid only for the particular evidentiary facts therein ruled upon.'' 1 Wigmore, Ev. §41.

A careful reading of the prevailing opinion will disclose that we have not violated the rule. Petition overruled.

DISSENTING OPINION.

DAUSMAN, J.—I am unable to concur in the majority opinion, and I regard the case at bar of such importance as to justify me in stating my reasons for dissenting.

What the word ''accident'' means, as used in the statute, is a question for the court. On this point there is no controversy. It is universally conceded that the word is to be taken in its ordinary and popular sense. Whether Addison Calvert came to his death by accident or by disease is purely a question

of fact; and this is the first question to be determined.
Under the familiar rule of appellate procedure, if the
finding of the board is a legitimate conclusion from
the evidence, we must sustain the award, even though
the contrary conclusion would be equally legitimate.
But, if the finding is not a legitimate conclusion, then
it is our duty fearlessly to reverse.

Since the majority opinion is so far-reaching in its
consequences, it seems to me that a compact state-
ment of all the evidence would be a source of satis-
faction to those who are directly interested in the
administration of the Workmen's Compensation Act.
Therefore I will set out the substance of all the evi-
dence, which is as follows:

George Calvert testified:

"I am a son of Addison Calvert. I am 25 years
of age. On January 3, 1917, I was working with
my father loading coal. We went to work at
seven o'clock that morning. My father was as
strong as common. There was nothing wrong
with him that I knew of. He was not complain-
ing any. His health before that had been good.
He had worked about every day that the mine
run. He was a blacksmith and did repair work
on lawn mowers and jobs like that. About 9
o'clock that morning we had half a car but could
not push it. After we had pushed on the car he
said 'My side hurts.' We got Mr. Snap and his
son to help us push it around to the room where
we could finish loading. We pushed the car up
over a kind of slope until it got to going down
hill and then we took it the rest of the way our-
selves into our other room. We started to finish
loading and while we were working he was on

one side of the car and I was on the other. 1
heard him holler 'Oh.' He was leaning against
the car holding his side. I asked him what was
the matter and he said 'I don't know.' He kept
saying 'Oh, my side.' He had his hand on his
left side. He said 'Take me over to the other
side of the car and lay me down.' He leaned
against me and I helped him around the corner
of the car and laid him down on a slack pile. He
wanted a drink of water and I got my bucket
and gave him the water but he said he couldn't
drink. I went back and got Mr. Snap and Bill
to come up there and I left them with father
while I went to the bottom to get some other
people. We took him out of the mine to the office
where the bookkeeper and timekeeper and Mr.
Adams (the mine boss) were. We laid him on a
cot, then called a doctor. I stayed with him until
he died. It was about 10:45 when he died. His
body was taken to the undertaker's, and then to
our home where Dr. Carson, Dr. Funk and an-
other person held an autopsy. My father was
addicted a good bit to the use of liquor. The
coal we were loading was tolerably small lumps
and father was shoveling at the time he cried out.
He had lifted a chunk right on the corner. The
coal was about like common. The lumps were
about as big as they generally are. The work he
was doing there was what we had been doing
night and day at the mine. The amount he was
lifting on that lump of coal when he cried out
was just the ordinary way of loading coal
and the ordinary load that he lifted. It would
weigh maybe 35 or 40 pounds. Sometimes

500 APPELLATE COURT OF INDIANA,

Indian Creek Coal, etc., Co. *v.* Calvert—68, Ind. App. 474.

a fellow lifts as much as 75 or 100 pounds. He was using the big flat scoop shovel which when filled with coal would weigh 25 pounds. He was doing what he had been doing day in and day out as long as he worked in the mine, and nothing extra. Mr. Adams talked to me right after we came up on top. I think I told him then that father was lifting a lump of coal that weighed about 15 pounds. It was a rough guess. I think I told him about us pushing the car, but I don't know whether I did or not."

Thornton Snap testified:

"On the morning of January 3, 1917, when we went into our working place Addison Calvert and his son were in their place, just a room between us. His son came after us to help them push a car. We helped them push it out of No. 11 to No. 12. After we got it to a point where it is a little down grade, they took it on and we went back. I do not believe we threw a half dozen shovels in our car until his son came and called us. We went to their room and found his father lying down on some slack, holding his hand over his heart. His son went after some other help. We put him on a stretcher. I gave him some water and we took him out on top. He was unable to drink the water. I noticed nothing wrong with him before I saw him lying down there. When we were pushing the car he was talking the same as he always had. He was cutting up and was all right as far as I know anything about it. As far as I could tell, he was a strong, hearty looking man, except that when we pushed the car on the switch he said 'Oh, my side.' But he just

went on and he never said anything more. We went back to our working place. I didn't see him loading the car and don't know what happened after we left until we were called again. We took him to the coal company office. He lived about three-quarters of an hour after that. I was present when the doctors held the autopsy on him."

Laura Calvert testified:

"From the time we were married my husband was in good health. He did lots of hard work. He might have taken a little medicine sometimes, but I do not remember of his ever having a doctor. He worked all he had a chance to work. I knew he drank. He would get kind of 'shot to pieces' and I would straighten him out and he would go back to work. It would take him two or three days to straighten up when he had these spells. He said sometimes his side hurt him. He would cough and say his side hurt him. When he was not working at the mine he worked at the blacksmithing shop or on the section."

Steve Adams testified:

"I am mine boss at the Indian Creek mine. I asked George Calvert after he had his father up in the office what happened. He said: 'We were loading a car—not very big chunks. He was lifting a chunk of coal to put on the car when he hollered.' After talking to George I went down and looked at the condition in the room and in the car. I found no big chunks. The shot of coal they were loading was broken up pretty well. The biggest chunk would weight about ten or fifteen pounds."

Dr. S. O. Carson testified:

"I am a practicing physician and surgeon. I am coroner of Knox county. As coroner I was called to view the body of Addison Calvert on the 3rd day of January, 1917. I went to his home in Vincennes and had an autopsy performed by Dr. Funk. I prepared the report of the autopsy which Dr. Funk signed. I observed what took place while the autopsy was being held. The aorta was ruptured. I found a diseased condition of the aorta and of the larger blood vessels around the aorta, which I think was the cause of the rupture. The aorta was very thin at the point of the rupture and broke through because of the thinness. This condition of the blood vessels had probably been existing for quite a while, but the rupture was instantaneous. Where we have a thinning process of the blood vessels brought about by disease, exertion or strain might cause a rupture; and sometimes in bad cases there is a rupture when a person is asleep, without any strain. The blood vessels around the heart were all more or less in a diseased condition, but there was a rupture at one point only. Such a rupture comes at the weakest part and sometimes without any exertion. The condition of his heart seemed to be normal but the walls of the blood vessels were thinner than normal. From the appearance of the wall and the condition we found there, it looked as though it might have been caused by strain or exertion of some kind."

Dr. V. A. Funk's written report of the autopsy:

"I performed an autopsy on Addison Calvert

Jan. 3rd, 1917, at which autopsy the following was noted:—

"The heart seemed to be normal. Also the arch of the aorta. About one and one-half or two inches below the arch in the wall of the descending aorta there was a thinning out of the wall of the aorta around where the perforation occurred, the walls at the site of the perforation being very thin, the perforation occurring at the right side of the vessel, the hemorrhage occurring back of the pleura and pushing the right pleura and lung forward, filling up the right pleural cavity.

"The cause of a perforation at this site where the vessel was thinned out beforehand, as this was, could be from several different reasons:— A chronic alcoholic might develop a weakening of the aorta at any position, causing a thinning of the wall and finally a rupture. It might also be due to syphilis, and might also be due to a tubercular focus in one or more of the mediastinal glands lying next to the arterial wall, causing a weakening and therefore a thinning and stretching at that point, which if the tubercular focus continues, sooner or later a perforation with fatal hemorrhages will occur. After the wall is thinned and weakened by whatever cause, the perforation might take place at any time. A sudden jar might cause it to rupture. Running across the street, or for a street car; or taking a few quick steps to get out of the way of some danger as from an approaching automobile, etc.; or any excitement whatever which would make the heart beat more rapidly for a few beats; or

ordinary labor; or any exercise whatever, which causes an increase in pulse beats, thereby raising the blood pressure of the aorta, would render that weakened place subject to rupture at any time. As the thinning goes on it might rupture during the patient's sleep or give way while sitting still or with a fit of coughing or laughing.

"One of the miners that night spoke of Mr. Calvert having complained of pain in the chest at this region two or three days before his death. This pain is in keeping with this condition, because as the condition progresses the patient would naturally have pain. Taking everything into consideration, there is no way of ascertaining how long this thinning process had been going on before the rupture occurred. It might have been several days or it might have been several weeks. No one could say as to the time that it had been progressing. Usually, however, these conditions arise slowly, and it is most probable that the thinning out of this vessel wall had been going on for several weeks.

"Considering everything, I believe that this condition in the beginning was a tubercular infection of a mediastinal gland which, due to its close proximity to the vessel wall, eroded the wall and caused a thinning out at that location.

"V. A. Funk."

In addition to the testimony of Dr. Carson, as above stated, he was asked the following question: "Now, you may state to the court, upon the performing of this autopsy, what caused the death of Addison E. Calvert?" He answered: "I see here from my records—it shows accidental rupture of the descend-

ing aorta, which caused his death.'' Obviously, this answer cannot be considered for any purpose. It is a mere statement of his conclusion as to what is shown by the record or report of the autopsy. That report is in evidence and speaks for itself. Having disregarded this question and answer, I find that there is not the slightest conflict in the evidence.

1. When considering what this evidence tends to prove, the mind naturally rests on the statement of Dr. Funk. When he said, ''Considering everything, I believe that this condition in the beginning was a tubercular infection,'' etc., he was stating his matured opinion, his deliberate judgment, his conviction, in the light of his learning, skill and experience as a physician and surgeon. His words can have for us no other meaning. As to the cause of the erosion of the wall of the artery, he could testify in no other way. The same observation is applicable to this statement of Dr. Carson: ''I found a diseased condition of the aorta and of the larger blood vessels around the aorta, which I think was the cause of the rupture.'' We are bound to give to the statements of these doctors full faith and credence. They were in a situation to know the truth as to the man's physical condition and the results that must necessarily flow from that condition. There is nothing in the testimony of the other witnesses which conflicts with their statements or which detracts therefrom in the slightest degree. Their testimony must be regarded as conclusive as to the facts concerning which they have testified.

We have the facts, then, that for a considerable time the man had been afflicted with a disease which had eaten into the wall of the descending aorta at a place near the heart. The wall there was so thin that

a rupture must inevitably result. From this cause alóne, death was imminent. The final excitant might have been the act of coughing or laughing, a sudden jar, a few quick steps, running across the street, ordinary labor, or any exercise whatever. The rupture of the artery would have occurred as the disease progressed without any excitant at all, and might have taken place while seated quietly in a chair or while asleep. If the rupture had occurred in his home when he was laughing or coughing, would anyone contend that he came to his death by accident? The fact that he happened to be working when the rupture occurred, does not alter the case a particle. He was doing his normal work. There was nothing unusual, extraordinary or fortuitous in the events of that morning. He was liable to die at any moment; and the most that can be said is that the fatal moment came when the unfortunate man was working. Manual labor of every kind requires more or less muscular exertion, involving accelerated and intensified heart action. Naturally, therefore, when a man is working, his arteries are subjected to a greater strain than when his body is in a state of repose. This is a simple and well-known physiological truth. But when a man is doing his usual work in the usual way the arterial strain resulting therefrom must be regarded as normal. While the deceased was shoveling coal in the usual way, and while his muscular activity was accompanied by the natural and normal blood pressure, the aorta burst because it had been thinned and weakened by disease. There is a direct causal connection between the disease and the death, and that fact excludes the idea of death by accident. How can it be said with the slightest semblance of verity that

the bursting of the aorta was the result of an accident? Who, by the most careful and persistent search, can find the accident that caused the death? I am compelled to the conclusion that the deceased came to his death by disease, and not by accident, and that no other legitimate conclusion can be deduced from the evidence. Compare the case at bar with the following: *O'Hara* v. *Hayes* (1910), 3 B. W. C. C. 586; *Kerr* v. *Ritchies* (1913), 6 B. W. C. C. 419; *Black* v. *New Zealand Shipping Co.* (1913), 6 B. W. C. C. 720 (cited in *Schroetke* v. *Jackson, etc., Co.* [1916], 193 Mich. 616, 160 N. W. 383, L. R. A. 1917D 64).

It seems that this is the conclusion to which the mind naturally would come were it not for the fact that apparently a different conclusion has been reached in certain analogous cases. Now, to what extent, if at all, should we be influenced by other cases, whether in seeming harmony or in seeming conflict with the finding in the case at bar? A full and thorough discussion of this question would be interesting and generally helpful; but I will not extend this statement by attempting it. I will content myself by saying that the rule of *stare decisis* is wholly inapplicable. That rule is applicable only where a principle of law is involved. 7 R. C. L. 1000; 11 Cyc 745; 15 C. J. 916 *et seq.* As a necessary corollary to the rule of *stare decisis* the courts have long recognized the beneficent principle that when dealing with evidence the human mind should not be fettered by socalled precedents. When searching evidence it is essential that the minds of judges and jurors should be free, in order that they may find the truth. This principle is so universally recognized that it is seldom

thought necessary to express it. *Kitchenham* v. *S. S. "Johannesburg"* (1911), 4 B. W. C. C. 311; *S. S. "Swansea Vale"* v. *Rice* (1911), 4 B. W. C. C. 298. In.very truth, for such duties there are no precedents; for it never happens that the evidence, the situation of the parties, and the subtle psychical influences operating on the triers of fact, are identical. 15 C. J. 919. The most that can be said is that some cases are merely analagous. Reasoning by analogy is the weakest form of reasoning and is inherently dangerous. Under our system of jurisprudence the idea that we can be bound by precedent in deciding questions of fact is more than impracticable—it is impossible. What matter, then, how or when or where certain courts, boards, commissions or other bodies have decided a question of fact which on appeal was sustained on the ground that there was "some evidence" to support it? On what principle can it be said that a previous decision of a question of fact is either controlling or persuasive? Such cases are useful only for the purpose of comparison.

An analysis of the majority opinion discloses that it does not determine the question *as a question of fact,* but rather *as a question of law* by putting upon the word "accident" a strange and extraordinary meaning. By enacting the Workmen's Compensation Law the legislature provided a species of workmen's *accident* insurance; but the effect of the majority opinion is to extend the law by judicial construction to include also *life* insurance. If the legislature had intended that the statute should include cases like the one at bar, surely it would not have been so improvident as not to have provided some equitable basis on which the feature of life insurance could stand. If

the plan evidenced by the majority opinion is to be adopted, it will result in awarding compensation in every case of death by heart failure, apoplexy, or other disease of any kind whatsoever, on the mere statement that the death *might* have been accelerated by the normal "strain and exertion" of the deceased's usual work; for that "strain and exertion" always exists. To bring about such a result by judicial construction is a palpable invasion of the province of the legislature.

2. Furthermore, I am of the opinion that Addison Calvert's death did not arise out of his employment; that such a death could not reasonably be said to have been within the contemplation of his employer at the time of entering into the contract of service; that it was not due to any external hazard which he was required to encounter in his working place, but was due to a fatal disease which lurked within him; that there is no causal relation between his death and his employment; and that his death was in no manner an incident of the service.

NOTE.—Reported in 119 N. E. 519, 525, 120 N. E. 709. Workmen's compensation: what is an "accident" or "personal injury" within the meaning of the act, L. R. A. 1916A 40, L. R. A. 1917D 114.