The Industrial Board, by a majority of its members, found that George H. McWilliams came to his death by accident arising out of and in the course of his employment. Compensation was awarded to his widow, Clara E. McWilliams, and to his infant dependent grandson, John Campbell. The employer contends that McWilliams' death was not accidental but was due to disease.
The firm of Owens and Fowler, as contractor, was constructing a macadamized road near the town of Lynnville, in Warrick county. McWilliams resided on a small farm in that neighborhood. He cultivated his farm and devoted a portion of his time to hauling rock from the rock crusher to the highway, having been employed to do the hauling by the contractor. On May 18, 1925, he was taking a load of rock from the crusher to the highway. The road on which he was driving was of a pronounced downward grade and he was compelled to use the brakes. It was "a pretty steep hill" which he was descending. When he had taken his load *Page 94 
to within about eighty rods of the place where it was to be delivered, his team ran away. (It was not the first time this team ran away.) He fell from the wagon and the team continued to run down the road until they were stopped by some workmen.
Mrs. Nordhorn resided within 300 feet of the place where McWilliams fell. Her daughter saw the team running without a driver, and she immediately called to her mother. Mrs. Nordhorn hurried to the assistance of McWilliams. She found him with his head against the bank and face downward. She rolled him over, and as she turned him he gasped. She noticed that blood had come from his mouth at the place where he had been lying. She had just succeeded in turning him over when Mr. Owens and Mr. Barclay arrived.
Lillie Schumacher, daughter of Mrs. Nordhorn, saw the team running past their house, and observed the rock flying from the wagon. She looked up the road and saw a man lying on the ground by the roadway. She informed her mother and telephoned to town for help. Then she followed her mother to the place where the man was lying. After her arrival, she observed that the injured man gasped; that his forehead was bruised; and that blood was running out of his mouth. She also observed the tracks at the road and could see where the team had lunged forward.
Norman Barclay was assisting in the construction of the highway, and was working near the home of Mrs. Nordhorn. He hurried to the place where McWilliams was lying, just opposite the little mulberry tree. McWilliams was alive when Barclay arrived. He noticed "a skinned place on McWilliams' mouth and a skinned place over his eye. There was a little blood in his mouth." He got water and washed McWilliams' face. He testified that he had known McWilliams for twenty years; that he was a man of good ordinary health; that *Page 95 
he farmed, worked at the rock quarry, and did a little of all kinds of work; and that he was between fifty and sixty years of age.
Cyrus Owens testified: "I knew McWilliams all his life, about fifty years. So far as I know, his health was good. I saw him immediately after the accident. He was lying at the side of the road, nearly opposite the mulberry tree. The team was down the road north of where he was lying. I did not see him fall from the wagon, but I saw the team running. My brother Clarence Owens was with me. Clarence is one of the firm of Owens and Fowler. Clarence went for a doctor and I went to McWilliams. As soon as I arrived, I felt of his pulse and put my ear down to see if his heart was beating. I learned that his heart was beating, but I cannot say how long it continued to beat after that. People came from town while his heart was still beating. So far as I know, he was in good health. He had been working for Owens and Fowler, hauling rock from the rock crusher. The rock crusher was in the woods. After loading the wagons there, the teams would travel west through the woods sixty or eighty rods to a highway; then they turned north onto a public highway. It was down a pretty steep hill. It was a well defined slope to where he was picked up."
Leo Parker testified: "I live three miles east of Lynnville. I knew George McWilliams. On the day of his death, I was working at the rock quarry. I fed the crusher and worked on the chute a while. I was there when McWilliams loaded his wagon. First we set the wagon under the chute and scooted it up closer and he let down the doors for the rock to run into the wagon. To scoot the wagon closer, we just lifted it up and pulled it over. It was an ordinary two-horse wagon. It had a regular rock body made of 2x4s with ends that you could raise up. It held a yard and a half of rock. It *Page 96 
had an end gate and a loose bottom. He shook the doors to get the rock out of them. It took a good deal of strength to do that. I saw him lift. He went west from the quarry. He had on his wagon a yard and a half. I do not know what that would weigh. I did not see him after he went away from the quarry. As to braking, the wagon had a lock stick in the rear to lock it. There were brakes on the rear wheels. That wagon did not have a spring seat on it. The driver sat on the rock. It had a rope from that stick to the driver so he could sit there and operate the brake. I do not know anything about how he met his death."
Arliss Siebe testified: "I live at Lynnville. I am a merchant. I knew George McWilliams. I saw him on the day of his death at the roadside where he fell off the wagon. I don't know how long he had been there. I went with Mr. Loomis and Mr. Robinson. His heart was beating. I laid my head on his breast and heard it. Cyrus Owens was there when I got there."
The coroner of Warrick county, who is a farmer, held an inquest with the assistance of Dr. Mills. After hearing the testimony of several witnesses and having made an examination of the body, the coroner decided that the man came to his death as a result of concussion of the brain on the spinal cord, caused by the fall from the wagon.
Owens and Fowler carried compensation insurance, and their insurance carrier arranged with Dr. V.H. Moon of Indianapolis to conduct an autopsy. Accordingly, on the fourth day after McWilliams' death, the body was taken from the grave and rather extensively dissected. His diagnosis was "calcified arterio-sclerosis of the coronary arteries; slight hemorrhage involving the conduction tract of the heart; and acute passive congestion of the lungs incident to heart failure." In *Page 97 
other words, he was of the opinion that the cause of death was heart failure due to obstruction of the coronary artery.
Dr. Moon's testimony is voluminous and nothing is to be gained by setting it out at length. It should be observed, however, that he made the following statement: "If I knew a man's heart was in that condition I would advise him not to work — not to get in any condition where he would be excited — because overexertion produces strain on the heart and if the heart is unable to meet the strain, it may be injured by it * * *. If I knew a patient was in that condition I would advise him to abstain from any physical work, because physical work is apt to throw a strain upon the heart * * * If the heart beat for five or ten minutes (after the fall) I would say it was concussion of the brain or some other cause that resulted in his death."
Dr. W.H. Mills, of Lynnville, was present at the autopsy. In his testimony, he made this statement: "If I had a patient with a heart in that condition, I would advise him to do light work and to stay on the level. I would advise him not to do heavy work and not to do anything that would excite him and cause heart exertion. It would seem probable that a man with a heart in that condition, who has been moving a heavy load of rock, might so exert himself as to increase heart action and hasten his death."
Dr. Charles F. Martin testified: "If it be a fact that his heart continued to beat after his fall, then in my opinion death was due to the shock produced by the fall. In other words, I think death was hurried along and occurred quicker because of the injury. It might be that any extra exertion would be a contributing cause of the death of a man with that affliction. It is very probable." *Page 98 
It is obvious that if the members of the Industrial Board who joined in the award believed the witnesses who testified that the workman's heart continued to beat for a considerable time 1. after he fell from the wagon, then they were logically impelled to accept the opinion of the men of medical science that death was due to concussion of the brain resulting from the fall. On that basis, the ultimate fact that the workman's death was due to accident arising out of and in the course of his employment is legitimately established.
At this point, we might bring our discussion to an end; but manifestly that would be unfair to counsel for the appellants. Their contention is that the workman died of disease, viz.: 2. calcified arterio-sclerosis of the coronary arteries. That the workman was thus afflicted is not controverted. However, it is a legitimate conclusion from all the evidence that the work the man was doing that morning — assisting in lifting the heavy wagon, shaking the doors of the lock schute, manipulating the brakes, and managing his team — was the immediate cause of death. By that statement we mean that the physical exertion incident to the work, the concussion occasioned by the fall from the wagon, and the inevitable excitement of the occasion, hastened the loosening of the calcareous deposit and thus precipitated death.
This court has uniformly held that where the employment hastens an existing disease to its final culmination in death, it is an accident within the meaning of the statute. In re Bowers
3. (1917), 65 Ind. App. 128, 116 N.E. 842; Indianapolis Abattoir Co. v. Coleman (1917), 65 Ind. App. 369, 117 N.E. 502; Retmier v. Cruse (1918), 67 Ind. App. 192, 119 N.E. 32; Puritan, etc., Co. v. Wolfe (1918), 68 Ind. App. 330, 120 N.E. 417; Indian Creek Coal, etc., Co. *Page 99 
v. Calvert (1918), 68 Ind. App. 474, 119 N.E. 519; UtilitiesCoal Co. v. Herr (1921), 76 Ind. App. 312, 132 N.E. 262.
As to the cause of the workman's death, two conclusions may be drawn from the evidence, either of which is legitimate. We have no way of knowing which conclusion the board adopted. If 4. the board concluded that death resulted from concussion of the brain caused by an accidental fall from the wagon, then the dependents are entitled to compensation. If the board concluded that death resulted from disease, but was hastened by the employment, then the dependents are likewise entitled to compensation, unless the rule recognized in the cases above cited be abandoned.
In this connection, it should be observed that whether a death or an injury arises out of and in the course of the employment is a question of fact, not a question of law. Muncie
5, 6. Foundry, etc., Co. v. Thompson (1919), 70 Ind. App. 157; American Hominy Co. v. Davis (1920),74 Ind. App. 622; Miller v. Beil (1921), 75 Ind. App. 13; United,etc., Coal Co. v. Williams (1921), 76 Ind. App. 249; Payne,Director, v. Wall (1921), 76 Ind. App. 634. That means that the question is not one of substantive law. It does not mean that rules of construction, rules of evidence, or other rules within what is known as "adjective law," are to be arbitrarily excluded. But surely such rules should never be invoked when dealing with a statute except when absolutely necessary to give effect to the legislative intent.
The award is affirmed. *Page 100