CITY OF ANDERSON *v.* BORTON.

[No. 19,557. Filed December 28, 1961. Rehearing denied February 1, 1962.]

Smith & Yarling, Robert S. Smith, Richard M. Hennessy, and David A. Steckbeck, all of Indianapolis, for appellant.

Robert R. Robbins, of Anderson, for appellee.

Ax, J.—Appellee Borton while employed by Appellant City of Anderson as a light and water meter reader claimed to have received personal injuries by reason of an accident arising out of and in the course of his employment by the appellant, which accident appellee claimed caused him to suffer an increase in his permanent partial impairment over a previous impairment from a prior industrial accident for which he had previously received compensation and from a second previous, but non-compensable, accident which had increased his impairment prior to the alleged accident complained of. After properly filing his claim on Form 9, upon a hearing before a single member of the Industrial Board, he received an award of compensation which award was subsequently sustained on appeal by the Full Industrial Board.

Appellant urges that the award is contrary to law.

A review of the evidence favorable to appellee and which is not disputed shows that on February 7, 1955, while working for Container Corporation of America, appellee Borton suffered an injury to his back for which he received a few weeks compensation for temporary total disability. Subsequently he continued to have pains in his back, and in September, 1956, he was operated on for removal of a bulging disc in the lumbosacral level, which disc was found to be diseased and was removed by an operation described as a laminectomy. This resulted in a 10% permanent partial impairment to the man as a whole for which he received benefits under provisions of the Indiana Workmen's Compensation Act by an award of the Industrial Board against the Container Corporation of America on February 9, 1957.

Prior to receiving this award, on or about December 12, 1956, Borton went to work for appellant City. On November 11, 1957, while working as a meter reader for the City, Borton's heel slipped off of a step and caused his back to "act up," which resulted in two weeks bed rest. Borton filed no claim for compensation benefits as a result of that injury. According to Borton's own testimony, at that time, Dr. Eicher who had performed the first operation on his back, established his permanent partial impairment at 15% by giving this information to Borton's attorney.

On the 25th day of August, 1959, while engaged in reading light and water meters, Borton leaned over to open a trap door in the back room of a house to go to a basement to read a meter, at which time Borton suffered a sharp pain down through his lower back which subsequently caused him to again have another operation performed on his back.

On December 31, 1959, this operation was performed on Borton by both Dr. Reed and Dr. Eicher, who had

performed the first operation on his back. At this operation it was found that there was a protrusion of another disc and that a nerve root under the disc was flattened and swollen. The disc was removed and then the protrusion was removed. The nerve was freed and a spinal fusion was performed on both sides of the spine.

The main question to be determined by this appeal is whether or not the evidence in the record is sufficient to sustain the findings of the Board, i.e., is the evidence competent to show that appellee Borton was impaired as a result of an accident arising out of and in the course of his employment or that there was a causal connection between his back injury or aggravation thereof and his employment?

A review of the testimony of appellee Borton on direct examination, which is not disputed, concerning the alleged accident, in pertinent parts, follows:

"Q. Will you relate to the court the situation and incident that happened August 25, 1959, wherein you sustained certain injuries?

A. I was reading meters on my job at 1228 Home Avenue. I went in to raise the trap door to go in the basement to read the water meter and as I reached over to raise the trap door I had a sharp pain down through my lower back and I couldn't straighten up at that time. I stood around a few minutes and finally made it to where I could straighten up and I read the meter and finished my book. It took half or three-quarters to finish the book and then I went in the office and told the boss, I think I said, 'I messed up my back.' I didn't think too much about it at that time. I got my book for the next day and went on home. The next morning I couldn't hardly get out of

bed and when I couldn't straighten up at all I went to the office and they gave me a pass to the Emergency Clinic.

Q. Tell the Hearing Officer, you talked about 'they,' the person you talked to at the office.

A. I went to my foreman, Ed Gurt, and told him that my back was bothering me and that I would like a pass to the Emergency Clinic.

Q. Is that in Anderson?

A. Yes, and the lady that usually took care of those things was on her vacation and one of the fellows filled out the form and gave me the pass, which I took and went to the Clinic. Dr. Austin examined me and gave me some treatment and some medical pills and told me to stay in bed, which I did, but it did not improve so I continued with the treatments. I took a series of five treatments at the Emergency Clinic. This condition continued and I seen Dr. Reed and he examined me and I had another series of treatments. It went on like that for a period of weeks and did not improve and I had pain all down my left hip, well, the left leg and lower part of my back until he finally put me in the hospital and decided surgery was necessary to remedy the condition.

Q. Regarding the incident on Home Avenue, about what time was it that this happened?

A. Approximately 11:45.

Q. What was the time which you finished reading the meters that day, approximately?

A. 12:30 or 1:00 o'clock; somewhere in there.

Q. What time did you report back to the office, the light plant office?

A. As soon as I finished the book.

Q. How much time elapsed?

A. Not over ten minutes.

Q. In your job there with the City what was the procedure so far as reporting to work of a morning and stopping your duties of a morning? What time would you report of a morning?

A. There was no set time at that time. We was working on a monthly basis, monthly salary. We had so many books to read within a time period and we done our work.

Q. What time did you ordinarily report to the office of a morning?

A. About eight o'clock.

Q. What time would you finish your duties during the day?

A. It would run from maybe 3:00 or 3:30; never later than 3:30.

Q. Your duties required you to read what type of meters?

A. Light and water meters.

Q. In your occupation as meter reader you were required to go into basements and also upstairs. Is that correct?

A. That's right.

Q. How long had you been in this occupation prior to your injury?

A. About 3½ years.

Q. And this was on your regularly established route that this accident happened?

A. That's right.

Q. And you hadn't stopped or left your employment for any reason immediately prior to this incident?

A. That's right."

On cross-examination, Borton testified as follows:

"Q. Now, coming back to August 25, 1959, you still were in the employ of the City of Anderson reading meters?

A. Right.

Q. This incident you say occurred at 1228 Home Avenue?

A. Yes.

Q. Do you know the name of the people? Was it Everett Miller?

A. That's right.

Q. Was anyone home that day?

A. I didn't see anybody.

Q. The back door was open?

A. I knock on the back door and hollo 'meter man. There was an enclosed back porch and the basement entrance was in that.

Q. You had read that meter before?

A. No, I had never been able to get in that house. It was on my regular route, but in quite a few places people aren't home. It so happened the door was open this time. It was the first time I was ever in there.

Q. You continued reading meters the rest of the day?

A. I had twenty or twenty-five more calls.

Q. Did you finish the day?

A. Yes.

Q. And then you reported to Mr. Gurt?

A. Yes.

Q. And he was your superintendent?

A. My foreman, yes.

Q. And told him you were having trouble with your back?

A. I told him I messed up my back.

Q. They referred you to the Emergency Clinic?

A. The next morning, yes.

Q. Dr. Austin saw you first?

A. Yes."

Appellant contends that the appellee did not suffer an accident arising out of and in the course of his employment by the appellant herein on August 25, 1959, and therefore the Industrial Board was in error in finding that he did so suffer such an accident arising out of and in the course of his employment and awarding him any benefits whatever under the Indiana Workmen's Compensation Act. The only testimony in the record describing the occurrence of August 25, 1959, is the testimony of the appellee as follows:

"I went in to raise the trap door to go in the basement to read the water meter and AS I REACHED OVER TO RAISE THE TRAP DOOR I HAD A SHARP PAIN DOWN THROUGH MY LOWER BACK AND I COULDN'T STRAIGHTEN UP AT THAT TIME."

By the appellee's own testimony he had not yet touched the trap door, nor did he describe a fall, a blow, a twist, a lift, a strain, any exertion or any untoward or unusual incident of any kind. This appellant urges that merely "reaching over" does not and cannot constitute an accident as defined by the Indiana Workmen's Compensation Act, and that the Industrial Board had before it no evidence upon which to base its finding that appellee sustained an accident arising out of and in the course of his employment by the appellant.

The appellee contends that there is more evidence before the court than a mere reaching over on the part of the appellee. He concludes that appellee "apparently opened the door because of the fact that he did read the meter after straightening up." The evidence to which appellee refers which is contained in the record is the hearsay history Dr. Roger Reed gave in his testimony, and under the decisions this testimony cannot be considered as basis for an award. *White Swan Laundry* v. *Muzolf* (1942), 111 Ind. App. 691, 42 N. E. 2d 391; *Durham Manufacturing Company et al.* v. *Hutchins* (1945), 115 Ind. App. 479, 58 N. E. 2d 444; *Indiana Bell Telephone Company* v. *Haufe* (1924), 81 Ind. App. 660, 144 N. E. 844.

In the case of *White Swan Laundry* v. *Muzolf, supra,* this Court reversed the decision of the Industrial Board because it was based upon hearsay evidence. In that case there was no direct evidence to prove the accidental injury. In this case we have appellee's own statement as to how the injury occurred and that is that it occurred as he "reached over."

In the case of *Durham Manufacturing Company et al.* v. *Hutchins, supra,* the court said:

"Physicians are permitted to testify as to statements made to them by one who makes them for the purpose of securing diagnosis and treatment; not to establish the truth of the statements made, but to show the basis of the doctor's opinion."

In the case of *Indiana Bell Telephone Company* v. *Haufe, supra,* the Industrial Board entered an award for the dependents of a deceased employee. The question was whether or not he had sustained an injury and whether or not such alleged injury had caused the death. The mother of the deceased, his brother, three

friends, and one doctor testified of the history he had given them. The Appellate Court reversed the award of the Industrial Board because it was based solely on hearsay testimony.

Dr. Reed, the examining and assisting physician in this case before us, testified as follows in regard to the history:

"Q. Will you please tell us what you found as a result of that examination?

A. At the time of the first examination on the 10th of September, 1959, Mr. Borton complained of back pain with radiation of pain into the left leg and he stated, as recorded on his clinical record, that this had been incurred on the 25th of August, while employed as a meter reader. He stated that he was attempting to lift a door or cover or something in his regular employment and developed back discomfort."

On cross-examination Dr. Reed answered affirmatively that the accident occurred while plaintiff stooped over, as follows:

"Q. You testified, Doctor, in your report here, you testified on this last occasion in the history related by Mr. Borton, he states he stooped over while working to open the trap door to read the meter and suffered severe sharp pain in the left side of his back.

A. Yes."

It is our opinion that the testimony of Dr. Reed, whether clear and uncontradicted, or conflicting, as it is in this case, cannot be accepted as probative evidence to establish the fact of accidental injury. The above cases

conclusively decide that point. The history testified to by a doctor cannot be considered proof of facts set out in such history.

From a review of the evidence, it is apparent that there is no evidence whatever of any increase in the work load or of any extra exertion. The evidence from Borton's own testimony shows that the so-called accident which he claims to have caused the aggravation of his pre-existing back injury occurred as he "reached over to raise the trap door." There is no evidence that it was caused by lifting the door—rather it is apparent that he felt the pain as he "reached over to raise the trap door."

We believe that this case falls squarely in line with the decision of our Supreme Court in the case of *U.S. Steel Corporation* v. *Dykes* (1958), 238 Ind. 599, 154 N. E. 2d 111, and followed by our Court in *Bundy* v. *Concrete Ready-Mix Company* (1960), 130 Ind. App. 542, 167 N. E. 2d 477. There is no evidence that appellee Borton suffered any unusual strain or exertion or any untoward or unusual incident of any kind which precipitated the back pains. On the contrary, there is evidence by appellee's medical doctor witness, Dr. Reed, that Borton had a constant traumatic condition and that some trivial act, such as walking about as a normal person, might cause the protrusion of the degenerated disc pressing on the nerve root.

In view of the fact that there is no conflict in the evidence concerning the performance of the act of bending over to lift the trap door when the pain occurred, and since there was nothing unexpected nor any unusual exertion connected with this incident, and with no conflict in the evidence that appellee's back had degenerated since his first injury to a point where pain and further damage might occur

merely by the act of walking about as a normal person, we are of the opinion that the evidence was insufficient to prove that the injury occurred because of any increase in his work load or of any extra exertion. We are also of the opinion that there was a lack of any evidence to prove that the act of bending over to lift a trap door was anything so unusual to appellee's customary work as to cause an aggravation of a previously existing degenerated back.

Following the present thinking of the Supreme Court in view of its holding in the *Dykes* case, *supra,* it seems logical that the only conclusion which reasonable men could reach from the evidence in this case, with all inferences reasonably deductible therefrom, that the appellee did not suffer injury as a result of and in the course of his employment.

For the foregoing reasons, the award of the Industrial Board is contrary to law and must be reversed.

The judgment of the Industrial Board is reversed with instructions to set it aside.

Ryan, C. J., Myers and Cooper, JJ., concur.

NOTE.—Reported in 178 N. E. 2d 904.