GENE WOLF *v*. PLIBRICO SALES AND SERVICE COMPANY & LIBERTY MUTUAL INSURANCE COMPANY.

[No. 2-673A148. Filed October 16, 1973. Rehearing denied December 11, 1973. Transfer denied March 30, 1974.]

---

112

*Frank A. Webster,* of Fort Wayne, for appellant.

*Leonard E. Eilbacher,* of Fort Wayne, for appellees.

SHARP, J.—The Appellant, Gene Wolf, filed his Form 9 Application which was granted by the Single Hearing Member and denied by the Full Industrial Board. Two members of the Full Board dissented from its decision.

This case was hotly contested by able counsel who presented a wide range of evidence including medical evidence. If the evidence *permitted* the decision of the Full Industrial Board we will not reverse unless it is contrary to law. The Appellee asserts that such evidence permits the inference that the Appellant's back problems were gradual and progressive.

Plaintiff was employed during the summer of 1971 by Plibrico Sales & Service, Inc., which company engaged in repair work on boilers and industrial furnaces. During a period in July of 1971 a crew of the defendant was working at Joslyn Steel in Fort Wayne, repairing a "walking beam furnace", which is described as being approximately 20 feet long and 9 feet wide and 28 inches high. The plaintiff was required to work in the furnace on July 3 and July 9, 1971, while Joslyn Steel was shut down for two weeks in July for its annual shut-down in the course of carrying out and re-

placing the lining of the furnace with refractory material. While working in the furnace, the crew would work either in a kneeling position or bent over. Plaintiff recalled that he did work two or three days a week and experienced normal aches as did his co-workers, but on July 9, 1971, he experienced a sharp pain while working in the furnace and he reported to his foreman that his back was "killing him", whereupon plaintiff went to his family doctor rather than the company doctor. After seeing his doctor, he returned to the job and worked several hours overtime. He worked the following week in Edgerton, Ohio, and then later was off a few days or a week until he was hospitalized by his doctor about August 10, 1971, for eleven days, and was unable to work again for defendant employer. He was diagnosed as having a severe lumbo-sacral sprain.

The description of the events by the Appellant are, in part, as follows:

"Q. When did you first notice the problem and what was the nature of the problem that you had in regard to your injury here?
A. Well, usually when you start working in this, why, your back starts hurting and you don't think too much about it. But it just kept getting worse to the point where I couldn't stand it. And the last day that we worked out there I told the foreman, I said, 'I can't take it any longer.' I said, 'I'd like to go to the doctor.' And he told me I could.
Q. And what was his name?
A. Dan Holom.
Q. And he's the man that we have the deposition of here?
A. Yes.
Q. And you went then to your family doctor?
A. Yes, sir.
Q. And what's his name?
A. Dr. Krueger.
Q. And he's here in Fort Wayne, Indiana?
A. Yes, sir.
Q. And that was approximately when, July when?
A. July the 9th."

\* \* \*

"Q. And that was the last day that you worked for Plibrico Sales & Service Company?

A. No, sir.

Q. Did you go back and try to work again?

A. I went to the doctor and went back to work. He gave me some pain pills and took some x-rays and I went back to work.

Q. And how long—when did you go back to work?

A. As soon as I went home and changed my clothes and I went back to work out at Joslyn.

Q. And how long did you work again?

A. That was the last day out there. We finished up there and then was in Egerton, Ohio, the next week. And I worked over there until I couldn't take it any longer and then I was off, I think possibly, maybe three or four days or a week. And then I went to Linton, Indiana, at General Electric down there and was down there approximately ten days and then the first of August was the last that I worked. Around the first of August, I can't say just the exact date."

\* \* \*

"Q. Now, would you describe again, I believe you say that July 9th is when you told your foreman that you felt so bad you were going to see your doctor, is that correct?

A. Yes, sir.

Q. And would you describe that it was sometime before that—how many days before then that you first noticed the back pain being worse than usual?

A. Well, I don't know for sure. Probably a week. Three or four days or five. Somewhere around there.

Q. That it started bothering you pretty bad?

A. Yes, sir.

Q. And it finally got so bad on the 9th of July that you decided that you better go see your family doctor?

A. Yes, sir."

\* \* \*

"Q. Now, did you tell Dr. Krueger that your back had been bothering you for two weeks?

A. I don't recall just what I told him.

Q. But, at any rate, you saw Dr. Krueger on that day on July 9th and you went back to the Plibrico job at Joslyn?

A. Yes, sir.

Q. Do you recall working overtime that day?

A. Yes, sir.

Q. As a matter of fact, you worked fifteen hours that day, does that sound right to you?
A. That's probably close to it.

Q. And at some point of time then in August I understand Dr. Krueger put you in the hospital?
A. Yes, sir.

Q. You didn't have any surgery?
A. No, sir.

Q. No specialists saw you?
A. No, sir.

Q. And then there came a time in December where Dr. Krueger released you to go back to work?
A. Yes, sir.

\* \* \*

"Q. I forgot what you told me when I asked if you told Dr. Krueger on July 9th that your back had been bothering you a couple of weeks, does that sound correct?
A. Like I say, it's been a good while ago. I don't recall. I think possibly it had been bothering me maybe a week.

Q. Do you know where you had been working a week before you went to see Dr. Krueger on July 9th?
A. Possibly, well I'd worked probably on the week ends at Joslyn, and then I was in and out. I probably was working at Goshen Rubber, just guessing. I don't know for sure.

Q. Now, on this July the 9th, when you first told your foreman that you wanted to go see your family doctor, is it correct that there wasn't any particular thing that you lifted, or nothing fell on you, there wasn't anything particular that you did that caused your back to hurt?
A. Other than being in this confined area.

Q. You weren't doing anything unusual on that particular day or that particular time that you hadn't done in similar situations in places like that?
A. Well, normally you don't work in a confined area like that. That's the only one I know of.

Q. Had you worked at Joslyn before?
A. Oh, off and on. You'll work there once a year at shut-down time.

Q. You work in the walking beam furnace?
A. Yes, sir.

Q. This was a shut-down period at Joslyn that you were rebuilding the furnace?
A. Yes, sir.

Q. There were several men on that job working in there?
A. Yes, sir.

Q. And some of them worked there more than you did, is that right?
A. Yes, sir.

Q. Now, were you having problems right from the start of your first day at that Joslyn job?
A. Well, when you crawl in a walking beam you're not in there long until your back starts bothering you anyway. This time it just kept getting worse to the point I couldn't take it any longer.

Q. Did I understand that at some point in time your back started bothering you and you felt it was getting progressively more painful and finally on July 9, you decided to go and see the doctor?
A. I asked Mr. Holom if it would be all right if I'd go.

Q. If I could refresh your recollection, is it possible that you hadn't worked at Joslyn between the 4th of July, which was a Sunday, until Friday, July the 9th, when you went to see the doctor?
A. That's possible.

Q. And would it be possible that you hadn't worked at Joslyn prior to that July the 4th, until back on June the 27th, the previous Sunday?
A. This, I can't answer for sure.

Q. When did you first tell the people at Plibrico that you thought you hurt your back on the job?
A. I don't recall. I presume probably the day that I told Mr. Holom I would like to go to the doctor.

Q. Didn't you tell me you didn't have any particular discussion on that day about the situation?
A. He asked me what I wanted to go for and I said, 'My back's a killing me.'

Q. That's about all that was said?
A. That's about all that was said, and he said, 'Okay.'

Q. How many men were working in that walking beam furnace at Joslyn for Plibrico?
A. Oh, normally I suppose there's probably maybe three or four guys working in that, in that confined area at a time. There's other work to be done too.

Q. No kind of accident happened on July the 9th in that walking beam furnace, did it?
A. No, sir. Ah —

Q. You were doing the same —

MR. WEBSTER: — Let him finish the question.

MR. EILBACHER: Oh, excuse me.

A. Other than when you just—when they hand this material for you to pound, you have to pick it up in a bucket or something and it's heavy and you're in this bent over position and it's —

Q. That's the same kind of work you did on any of the other days that you were working inside there?

A. Either that or we were tearing out. I can't say just exactly what we were doing.

Q. The work was pretty much the same each day that you worked in there?

A. Yes, sir."

Dr. Krueger is a general practitioner in Fort Wayne, Indiana. He first saw the Appellant in regard to the back condition on July 9, 1971. He diagnosed the condition as a lumbo-sacral strain. The Appellant had told the doctor that he had been working in a bent over position for some period of time in a 28-inch space and, after working in the confined area, his low back began paining him rather severely. The doctor testified that working under the conditions reported by Appellant could be the cause of a lumbo-sacral sprain.

On cross-examination, when asked about the onset of Appellant's problems, Dr. Krueger testified:

"Q. Dr. Krueger, I note that in the same letter to which Mr. Webster referred, you reported a history taken from the patient that he had had a backache off and on for the previous two weeks. Do you have that recorded in your office notes?

A. Yes, I do.

Q. Did he give you any exact date as to the onset of his symptoms?

A. No, he didn't.

\* \* \*

"Q. Did he relate to you in his history any specific accident or date which initiated the onset of his symptoms?

A. Are you talking about from the first visit?

Q. Yes, well from the time he first had symptoms with his low back.

A. The only specific date was of the tamping incident and

I have not recorded which day that was that he performed that action.

Q. That was when he was running the sand tamper, the machine?

A. Yes.

Q. Did he see you following that incident involving the sand tamper?

A. Yes.

Q. That was after your initial consultation with him, was it not?

A. Yes."

An osteopath testified for the Appellant as follows:

"Q. What did you find?

A. I found upon examination of Wolf a frozen sacroiliac joint involving the left sacroiliac. We had evidenec of a sacralized fifth lumbar. He presented a chronic preformis syndrome muscle spasm or syndrome." The pain syndrome I would call it a sacro genic telalgia."

\* \* \*

"Q. Did he give any history as to what he was doing and what resulted?

A. Well, he was working on a furnace and he was kneeling down and he had this acute pain that struck him in the back, in the low part of his back.

Q. All right. Now, doctor, would the injuries that he had be consistent with his history that he gave you as to what the pain that he had at that time being the cause of what you found wrong with him?

A. Yes. I feel that this strain was the motivating factor that precipitated this pain in his back.

Q. And all the other items you itemized, the frozen sacro-illiac, the sacralized fifth lumbar, the chronic preformis syndrome as well as the sacro genic telalgia, these were definitely related to that, that type of history?

A. Yes, correct."

\* \* \*

"Q. The question is, do you have an opinion, assuming these facts, within a reasonable medical certainty, with the results that you found, were consistent with the history?

A. Yes. I feel this man will have a problem—that is a latent problem. And I think that I would feel that he could

have any place from a fifteen to a twenty-five per cent disability."

\* \* \*

"Q. Then you are giving him fifteen to twenty-five percent permanent-partial impairment based on this?
A. Yes."

\* \* \*

"Q. Did this patient tell you that at the time of your examination he was employed with W. C. Grant Company as a steel metal worker?
A. No. This man—he was—he wasn't able to work at his regular job and this was an extra little job he had manufactured or gone out and found. I don't remember if it was night watching or some job that gave him a little bread and butter money or something, because he was hard up financially, if I recall the statement that the man made—that he couldn't go to work or unable to go to work at his regular job and he had this industrial injury or claim and he wasn't able to go back to work because he was supposed to be totally disabled and that was the reason he came over to me to see what could be done for him. He wanted to go to work. He is a man that had desire and ambition. I mean he wasn't lazy. He wasn't a welfare type individual. He was enthusiastic. He impressed me of this nature. In other words, there wasn't in my evaluation— he didn't impress me as one of those free loafers (sic)"

An orthopedic surgeon called by the Appellee testified:

"Q. And you feel that the back will hold up without any further problems, assuming no unusual accidents or trauma?
A. I think this is a reasonable medical certainty, but I don't think anybody could guarantee whether a person's back is going to bother them again soon or later on or not."

\* \* \*

"Q. Does normally an x-ray show a severe lumbosacral strain?
A. No.
Q. You have no quarrel with Dr. Krueger's diagnosis and treatment, history that you got regarding the accident?
A. Well, I didn't receive any information from Dr. Krueger that apparently he felt he had a soft tissue injury to his back and certainly have no—
Q. Does this involve the muscles and the ligaments of the back rather than the bones of the back?

A. Strains, the muscles or ligaments, yes.

Q. And with a severe strain is there a weakening of the ligaments or muscles of the back then?

A. Well, they are weak while they are painful.

Q. And with a person with this type of strain do they have acute stages where they have difficulty and other times when they will be relatively free from any symptoms?

A. Speaking in generalities, we see patients like this.

Q. And you saw Mr. Wolf, the one time in July of 1972, is that correct?

A. That's right.

Q. You have never seen him before or since?

A. Right.

Q. And you have never seen him while he was in an acute stage of this strain?

A. No.

Q. The only history that you got was what you took down from Mr. Wolf, is that correct?

A. That's right.

Q. You received no reports from Dr. Krueger or anybody else?

A. No.

Q. Could you make a better evaluation of a permanent partial impairment if you saw him during the acute stage?

MR. EILBACHER: I am going to object to the question for the reason that it is assuming that he has a periodic acute stage and I believe that is simply not borne out by the evidence. However, under the rules the doctor can answer the question, he is entitled to.

A. Well, it is a question that doesn't go along with his history, according to the history I received he hasn't had any acute stages, at least up until the time I seen him since last December.

Q. At least that was your understanding of what he said, is that correct?

A. That is what he told me.

Q. You don't remember his exact words?

A. No, I have recorded here that he had no complaints at present, that he had some discomfort when he first returned to work around December of 1971, and his back hasn't bothered him at all since approximately the middle of December or 12th of December. This is what he told me, I didn't record this exact terminology or what exactly he said.

Q. Did he indicate to you that he was doing a much lighter work than what he had done before?

A. He said he was working with a different company than he was when he had his back problem and doing sheet metal work, which wasn't as heavy as the previous job.

Q. Would he be less apt to have a recurrence of acute stage if he did take care not to do any heavy lifting or to take care not to—the way he handled himself in regard to his back?

A. I think in general a person is less likely to have a flare up of symptoms if they do lighter work as compared to heavier work."

\* \* \*

"Q. Is this history that you got and treatment of it, so forth, consistent with a severe lumbosacral sprain?

A. I think so, yes."

The Indiana Workmen's Compenastion Act provides that an employer must pay compensation for personal injury "by accident arising out of and in the course of the employment. . . ." Ind. Ann. Stat. § 40-1202 (Burns 1965 Repl.), IC 1971, 22-3-2-2. A compensation claimant has the burden to prove that he was injured as a result of an "accident," and it is not necessary that the employer show that a negative award is supported by a preponderance of the evidence. *Lincoln* v. *Whirlpool Corp.* (1972), 151 Ind. App. 190, 279 N.E.2d 596. The Industrial Board specifically found that Appellant failed to carry his burden of proof as follows:

". . . That for some time prior to July 9, 1971, plaintiff had complained of a sore back while working in the 'walking beam furnace.'

"It is further found that on July 9, 1971, while working in the 'walking beam furnace,' the plaintiff did not experience any untoward event of any incident giving rise to the condition complained of; that, as heretofore found by a majority of the Board, said condition existed and pre-dated the date of July 9, 1971 and that upon the facts in the record a majority of the Board cannot find any accidental injury in the course of the plaintiff's employment."

This court is required to disregard all evidence which is unfavorable to the findings of the Board and consider only those facts and those reasonable inferences which support such findings. *Pittsburgh Testing Laboratories* v. *Kiel* (1960), 130 Ind. App. 598, 167 N.E.2d 604; *Lincoln* v. *Whirlpool Corp., supra.* Further, if the Industrial Board, in determining the ultimate facts, reaches a legitimate conclusion from the evidential facts, this court cannot disturb that conclusion, even though it might prefer another conclusion equally legitimate. *Lasear, Inc.* v. *Anderson, et al.* (1934), 99 Ind. App. 428, 433, 192 N.E. 762; *C. & E. Trucking Corporation* v. *Stahl* (1962), 135 Ind. App. 600, 181 N.E.2d 21.

The word "accident" as used in the law of workmen's compensation must be distinguished from its meaning as used in accident insurance policies. *Indian Creek Coal & Mining Co.* v. *Calvert* (1918), 68 Ind. App. 474, 119 N.E. 519. The first Indiana case in which this court appears to have adopted a specific meaning is *Haskell and Barker Car Co.* v. *Brown* (1917), 67 Ind. App. 178, 117 N.E. 555, in which it was stated:

> "The word 'accident' in the act in question is used in its popular sense, and means 'any unlooked for mishap or untoward event not expected or designed.'"

Such definition has persisted to this date and has been cited in numerous cases, although the standard as to the type of mishap or event has been broadened. Dean Small reviews the earlier cases and says there was a time when the courts were inclined to view an accident "as some sort of sudden traumatic violence, and an injury as the result or the consequence thereof." Small, *Workmen's Compensation Law of Indiana* (1950), Section 5.2, p. 99. While the standard has been broadened, this Court has not gone so far as to adopt the rule that, if a claimant worked for the employer during the period of his life in which his disability arose, that is suffi-

cient to sustain the burden of proof as to the occurrence of the accident within the meaning of the Act. *George* v. *Interstate Metal Products* (1955), 125 Ind. App. 406, 126 N.E.2d 258. In *George,* this Court reviewed the earlier case of *Indian Creek Coal & Mining Co.* v. *Calvert, supra,* and stated at 126 N.E.2d 258, 260:

> "We do not interpret that case as in any sense abandoning the well-known rule that in order to show an accident there must be some untoward or unexpected event."

As Mr. Segar has correctly concluded in his 1968 Supplement to *Small,* there still must occur an event:

> "In passing, however, it should be noted that the Court still requires some untoward or unexpected event, however unspectacular it may be. . . ." *Small* (Segar), *Supplement,* Section 5.1, p. 33.

Dean Small observed that, by far, the greater number of injuries and deaths as a result of industrial accidents are occasioned by trauma. But he further observes that internal exertion or strain can lay the basis for an accidental injury equally as well as external trauma. In his original text, at Section 5.1, Small cites two cases to support his proposition. The first, *Indiana Car and Equipment Co.* v. *Celotto* (1919), 69 Ind. App. 341, 121 N.E. 834, involved a fact situation that, between 5:00 and 6:00 in the afternoon of a date certain, the employee was lifting a car sill when he felt a sudden and violent pain in his back. The issue became whether the subsequent disability was a result of a prior "tuberculosis in the vertabrae" or whether the lifting caused a traumatism in the area of the lumbar spine. This Court held that the evidence fairly tends to support the conclusion reached by the Board in awarding compensation on the ground that the plaintiff had received an injury by accident.

In the second textbook case, *Morgan Packing Co.* v. *Monroe* (1934), 99 Ind. App. 321, 192 N.E. 320, the plaintiff, while at work, was engaged in helping to place an electric motor,

weighing 400 pounds, upon a platform or shelf, and in lifting and pulling on the motor and sliding it over upon the shelf, he developed a sudden, sharp, and acute pain in his left hip, which caused him to limp, and gradually grew worse until it resulted in his present disability. This court approved the finding of the Board that the plaintiff had, indeed, sustained an accident.

Dean Small cites no other cases in his original text to constitute an industrial accident, and it is significant to note that in each of the two cases, the plaintiff was able to prove some specific event which occurred at a certain time and place which resulted in the strain. Again, in the Supplement to the original text, Mr. Segar observes that this court still requires an event. He then adds:

> "This does not mean, however, that the Court has reverted to sudden traumatic violence as a test for accidental injury."

All of the testimony here discloses an "event" which occurred in the course of employment and there is no permissible inference to the contrary. Mr. Segar further observes that, where the medical evidence specifically connects a back difficulty to a specific lifting incident, the reasoning of the heart cases has been applied. He cites *Lock-Joint Tube Co.* v. *Brown* (1963), 135 Ind. App. 386, 191 N.E.2d 110, in support of his interpretation of the modern rule. The *Lock-Joint* case directly involved a question as to whether the employee had sustained an accident. The facts of the accident considered by the court were:

> "I took the side off the square machine and went to set it on the floor; when I got pretty close to the floor with it, I got a catch in my neck and then dropped it. I tried to raise up then, and I couldn't for a minute or so."

This court affirmed the award in favor of the employee and agreed that the employee had sustained an accident. It was pointed out that he was engaged at the moment of the onset of the sympton in heavy work and that an event occurred to

which the employee could point as the origin of his back problems.

The Appellant premises his argument primarily on *Rankin* v. *Industrial Contractors, Inc.* (1969), 144 Ind. App. 394, 246 N.E.2d 410, 413, 414-415, where the Appellate Court, En Banc, said:

> "The decision of the Hearing Member was consistent with this broad mandate. In reversing the Hearing Member and denying an award in this case the Full Industrial Board has acted contrary to the mandate of the Workmen's Compensation Act.
>
> "We conclude that the evidence in this case was not in conflict in any real sense. It appears that this evidence, together with all reasonable inferences which could be drawn thereof, supports the conclusion that the injury to the plaintiff was in the course of his employment. In reading the Appellee's brief, it appears that the Appellee would require the claimant in a workmen's compensation case to negative the possibility of any other cause for claimant's disability. We do not think this is the law.

> "In the case of Steele v. Anderson Co. (1956), 126 Ind. App. 445, 451, 133 N.E.2d 896, 899, this court stated:

>> 'We further recognize that where an accidental injury, arising out of and in the course of the employment, aggravates, accelerates or activates a pre-existing condition of or injury to an employee, the right is compensable.'

> "Considering the testimony of Dr. Fisher, supra, and favorable to the Appellee, one cannot escape the conclusion that there was an aggravation directly resulting from a condition of employment. While there *could* have been other causes for the Appellant's injuries, there is absolutely no evidence of other causes in the record of this proceeding."

*   *   *

> "When the undisputed facts lead to the conclusion that such injury arose out of the Appellant's employment, it is the duty of this court to reverse the decision of the Industrial Board. See *Whaley* v. *Steuben County REMC* (1966). 139 Ind. App. 520, 221 N.E.2d 435.

> "The uncontradicted facts in this case are squarely within the principles announced by this court. In *American Maize Products Co.* v. *Nichiporchil* (1940), 108 Ind. App. 502, 511. 29 N.E.2d 801, 805 this court stated:

'While it is true that the appellee can point to no particular date nor to a particular blow which produced the resultant injury, yet it is not necessary that the accident occur at any particular or specific time. The series of blows to the appellee's hands produced the injury and loss which was an unintended and unexpected occurrence.'

"The decision of the Industrial Board is contrary to the statement in *Standard Cabinet Company* v. *Landgrave, supra.*

"The Appellee relies heavily on the case of *City of Anderson* v. *Borton* (1961), 132 Ind. App. 684, 178 N.E.2d 904. The evidence in that case was that the claimant merely 'reached over' and experienced a back injury. The contrast between the City of Anderson case and the instant one is demonstrated at page 694 of 132 Ind. App., page 909 of 178 N.E.2d, where this court stated:

'In view of the fact that there is no conflict in the evidence concerning the performance of the act of bending over to lift the trap door when the pain occurred, and since there was nothing unexpected nor any unusual exertion connected with this incident, and with no conflict in the evidence that appellee's back had degenerated since his first injury to a point where pain and further damage might occur merely by the act of walking about as a normal person, we are of the opinion that the evidence was insufficient to prove that the injury occurred because of any increase in his work load or of any extra exertion. We are also of the opinion that there was a lack of any evidence to prove that the act of bending over to lift a trap door was anything so unusual to appellee's customary work as to cause an aggravation of a previously existing degenerated back.'

"In this case there was precisely the type of evidence this court found wanting in the *City of Anderson* case, *supra.*

"We are not unmindful of the limited scope of review by this court of Industrial Board findings. Notwithstanding this, the Industrial Board's decision in this case is manifestly contrary to the letter and spirit of the Workmen's Compensation Act."

(It should be emphasized that the writings of Dean Small and Mr. Segar were published before the advent of *Rankin.*)

Without further belaboring of the point we find the facts, reasoning and result of the *Rankin* case directly relevant and

applicable here. A careful examination of the entire record here leads inescapably to the conclusion that the Appellant's injury directly resulted from an "incident" or "accident" in the course of and arising out of the scope of his employment. There is no evidence whatsoever to sustain a conclusion that such injury had its origins elsewhere. This conclusion is especially sustained by the testimony of the Appellee's medical expert.

The decision of the Full Industrial Board is hereby reversed and this cause is remanded to the Industrial Board for proceedings not inconsistent with this opinion.

Hoffman, C.J. and Staton, J., concur.

NOTE.—Reported at 301 N.E.2d 756.

## ON PETITION FOR REHEARING

PER CURIAM—The appellees have filed herein their Petition For Rehearing addressed to our opinion handed down on October 16, 1973. The first paragraph of appellees' Petition alleges, in part:

"1. The Court, at page 2 of its published opinion erroneously recited the critical factual issue in the case as '. . . but on July 9, 1971, he experienced a sharp pain while working in the furnace . . .' . . ."

We have carefully examined the record and find that the appellees' assertion is correct. Only in appellant's Form 9 application and in the testimony of Dr. Biery in his recitation of the history given to him by appellant, is there any reference to the appellant experiencing any sharp pain on July 9, 1971. The appellant's testimony concerning the matter, repeated several times through the transcript, and set out in our original opinion, can be summarized as follows: That as a result of working in a kneeling or a bent over position in a confined area my back started hurting and finally on July 9 my back was killing me and "I just couldn't stand it any longer". We therefore correct our original opinion by deleting

from the second paragraph of page two the words "he experience a sharp pain while working in the furnace and".

With this correction we re-affirm our original opinion and its reliance on the case of *Rankin* v. *Industrial Contractors, Inc.* (1969), 144 Ind. App. 394, 246 N.E.2d 410. In our view, the fact situation in *Rankin* supporting the determination of an accident in that case, namely the repeated jolting of the plaintiff in a forklift truck, is applicable to this case, in which the accident consisted of repeated strain to appellant's back occasioned by his working in a kneeling or bent over position in a confined area only 28 inches high, resulting in a severe lumbosacral sprain. We therefore reassert our original statement that the testimony given leads to the conclusion that the appellant's injury directly resulted from an "incident" or "accident" in the course of and arising out of the scope of his employment.

The appellees' Petition For Rehearing is denied.

NOTE.—Reported at 304 N.E.2d 355.